[Cite as *State v. Riedel*, 2017-Ohio-8865.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 104929

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# JUSTIN W. RIEDEL

DEFENDANT-APPELLANT

## JUDGMENT:
### AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-603040-A

**BEFORE:** E.T. Gallagher, J., McCormack, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** December 7, 2017

**ATTORNEY FOR APPELLANT**

Eric M. Levy
55 Public Square, Suite 1600
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY:    Gregory Paul
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Justin Riedel, appeals from his domestic violence and illegal cultivation of marijuana convictions following a jury trial. He raises the following assignments of error for our review:

1. The trial court erred when it failed to suppress evidence obtained as a result of an illegal search of Riedel's home which was conducted without a warrant and when consent to search was involuntary and under duress and where the trial court failed to consider whether the taint of the illegal entry into the home was extinguished prior to obtaining consent to search the home.

2. The trial court erred when it failed to suppress a written consent to search the home and evidence obtained thereof where Riedel was under arrest and had requested an attorney and the consent was obtained without providing *Miranda* warnings.

3. The trial court committed plain error when it gave a defective jury instruction for domestic violence.

4. Riedel was denied effective assistance of counsel when trial counsel failed to object to the improper domestic violence jury instruction.

5. The trial court erred in finding Riedel guilty of domestic violence and illegal cultivation of marijuana where the evidence presented at trial was insufficient to overcome Riedel's Crim.R. 29 motion and to support a conviction for either offense.

6. The trial court erred in finding Riedel guilty of domestic violence and illegal cultivation of marijuana as the manifest weight of the evidence did not support Riedel's convictions.

{¶2} After careful review of the record and relevant case law, we affirm Riedel's convictions.

## I. Procedural and Factual History

{¶3} In February 2016, Riedel was named in a seven-count indictment charging him with kidnapping in violation of R.C. 2905.01(A)(3), with firearm and forfeiture specifications; felonious assault in violation of R.C. 2903.11(A)(1), with firearm and forfeiture specifications; aggravated menacing in violation of R.C. 2903.21(A), with a forfeiture specification; domestic violence in violation of R.C. 2919.25(A); illegal manufacture of drugs or cultivation of marijuana in violation of R.C. 2925.04(A); drug trafficking in violation of R.C. 2925.03(A)(2); and obstruction of official business in violation of R.C. 2921.31(A), with firearm and forfeiture specifications.

{¶4} In May 2016, Riedel filed a motion to suppress evidence along with several supplements. In his motion to suppress, Riedel argued that although he signed a consent to search form allowing police officers to search his home, it was the result of coercion and duress. He further argued that the arresting officers failed to provide him with *Miranda* warnings, and therefore, the trial court was required to suppress oral statements made to police after his arrest.

{¶5} Following a suppression hearing, the trial court granted Riedel's motion to suppress incriminating statements made following his arrest based on the failure to provide *Miranda* warnings. However, the trial court denied his motion to suppress evidence seized from his home. With respect to the validity of Riedel's consent, the trial court found that "the state met its burden of clear and positive evidence that Mr. Riedel voluntarily consented to the search of his home."

{¶6} In July 2016, the case proceeded to a jury trial, where the following evidence was adduced.

{¶7} In January 2016, Cleveland police officer David Wagner and his partner received a dispatch that an individual, later identified as Jasmine Rowe, had reported that a woman was being held against her will at Riedel's home in Cleveland, Ohio. When the officers arrived at the scene, they knocked on the front and side doors, but received no response. In an effort to obtain additional information, Officer Wagner spoke to Rowe directly and learned that the female victim, D.F., had contacted Rowe through Facebook and stated that she was "beaten, was handcuffed, and was being held against her will in [Riedel's] house."

{¶8} Based on the information gathered from Rowe, Officer Wagner "absolutely believed the victim was in [Riedel's] home." Officer Wagner testified that he then contacted his supervisor, Sergeant Tim Fitzpatrick, and asked him to come to the scene so that they could determine how to proceed. When Sergeant Fitzpatrick arrived at Riedel's home, Officer Wagner showed him the subject Facebook messages. Eventually, additional police officers and a SWAT team were called to the scene. Over the course of the next several hours, the police unsuccessfully attempted to contact Riedel on his cell phone. Just before the SWAT team was set to enter Riedel's home, Officer Wagner observed Riedel and D.F. walk out the side door of the home. Riedel was immediately apprehended by members of the SWAT team and was ushered into a nearby squad vehicle. The victim was taken to an EMS wagon for medical examination.

{¶9} Once SWAT secured the residence, Detective Todd Staimpel, of the Cleveland Police Department, conferred with Riedel in an effort to obtain his consent to search the residence. Det. Staimpel testified that he obtained a consent to search form from his vehicle and presented it to Riedel. According to Det. Staimpel:

> We explained everything to him. He signed it, he gave us permission to go ahead and go in and search the premises. And that's what we did.

{¶10} Det. Staimpel testified that if Riedel had declined to sign the consent to search form, the police would not have searched his home until they obtained a search warrant.

{¶11} Upon receiving written consent, Det. Staimpel and two other detectives entered Riedel's home. Det. Staimpel testified that the detectives recovered three firearms containing live rounds, body armor, a police baton, a rocket launcher, marijuana plants, dried marijuana, and equipment consistent with a marijuana growth operation. The total weight of the marijuana removed from Riedel's home was 1,177 grams.

{¶12} Detective Darren Robinson of the Cleveland Police Department testified that he photographed the evidence discovered inside Riedel's home during the initial search. Det. Robinson stated that he photographed all evidence that may have been relevant to the purported crimes, including photos of the various weapons, bloody tissues, marijuana plants, and cultivation materials. In addition, Det. Robinson testified that he photographed the injuries sustained by D.F., including visible injuries to her face, nose, arms, knee, and shoulder.

{¶13} Rowe testified that she is friends with D.F. and was aware that D.F. and Riedel had previously been in a romantic relationship. Rowe testified that D.F. would often show up to her house "with bruises all over her." On one particular occasion in November 2015, D.F. had bruises on her back, legs, face, and shoulders. Following that incident, Rowe permitted D.F. to live with her. Rowe testified that D.F. stayed with her for a few months until she suddenly left just days before this incident.

{¶14} Approximately one day after D.F. left Rowe's home, she returned to retrieve clothing from her bedroom. Rowe testified that she was concerned because she knew D.F. had been spending time with Riedel. Rowe did not hear from D.F. for several days and decided to send her a Facebook message to ask why she had suddenly moved out. Rowe testified that shortly thereafter, she received a Facebook message from D.F. The message stated that Riedel was keeping her at his home against her will, that he was beating her, and that she had left Rowe's home because Riedel had threatened to kill Rowe and her children if she stayed. Rowe testified that she and D.F. exchanged several more messages before Rowe finally decided to contact the Cleveland police. Rowe stated that she debated whether to call the police but determined it was necessary once D.F. stated that she could not leave Riedel's home because she was handcuffed.

{¶15} D.F. testified on behalf of the state. Before discussing her relationship with Riedel, D.F. admitted that she has a criminal record stemming from her past addiction to heroin. She testified that she has three children but does not have custody of any of the children as a result of her criminal history and drug use. She further testified that she

previously engaged in prostitution to pay for drugs, but stated that she is currently clean and sober.

**{¶16}** D.F. testified that she met Riedel in 2011 and that they soon began a romantic relationship that lasted approximately four years. However, D.F. clarified that they were not dating at the time of the incident. D.F. testified that during the course of their relationship, she lived with Riedel for "months" in 2013 before their relationship began to deteriorate when D.F. was sent to jail on unrelated charges. D.F. testified that when she got out of jail in April 2015, she and Riedel unsuccessfully attempted to repair their relationship. Thereafter, D.F. moved in with Rowe, and had been living with her for approximately four or five months.

**{¶17}** D.F. testified that on the Friday before Riedel's arrest, she was with Riedel when she received a phone call from another man. D.F. stated that Riedel immediately became upset and broke her phone. According to D.F., Riedel then "threw [her] down the steps" and "head butted [her] after [they] were at the bottom of the steps." D.F. testified that Riedel threatened to kill them both and placed a gun to her head. As a result, she was too frightened to attempt to leave Riedel's home that evening.

**{¶18}** The following night, D.F. convinced Riedel to drop her off at Rowe's house. D.F. testified that Riedel would only let her leave his home if she took a prepaid cell phone that he could contact her on. On Sunday morning, Riedel called D.F. and asked to pick her up. D.F. testified that she agreed to meet Riedel because she knew he would have harassed her all day if she had not allowed him to pick her up.

{¶19} On Sunday evening, one of D.F.'s prior "clients" called her on the prepaid cell phone, which caused Riedel to "freak" out. D.F. testified that Riedel punched her in the face with a closed fist and began screaming obscenities at her. Riedel then took D.F.'s phone and pretended to be her through text messages. D.F. testified that Riedel asked her prior client to meet him near Rowe's house at 10:30 p.m. When D.F.'s prior client arrived at the location of the meeting, Riedel pointed a gun at him and told him not to contact D.F. anymore. Riedel and D.F. returned to Riedel's house, where he continued to be verbally and physically abusive. D.F. testified that Riedel broke her nose and that she "had to try to get [her] nose to stop bleeding twice because it was really hard to get it to stop bleeding."

{¶20} On Monday morning, Riedel drove D.F. back to Rowe's house and made her get all of her belongings. Riedel informed D.F. that she would not be staying with Rowe anymore and was going to be living at his house. When they returned to Riedel's home, D.F. did not feel free to leave because Riedel was carrying a gun. When Riedel fell asleep, D.F. sent Rowe a Facebook message asking her to send help. D.F. testified that she was too scared to attempt to leave the house while Riedel was sleeping because she did not know if he was just pretending to be asleep. She admitted during cross-examination that her statement to Rowe that she was handcuffed was not true, but that "it was like a metaphor."

{¶21} At the close of the state's case-in-chief, Riedel moved the trial court to dismiss all charges pursuant to Crim.R. 29. After a brief discussion on the record, the trial court denied Riedel's motion.

{¶22} Riedel testified on his own behalf. He stated that he began dating D.F. in 2011 while she was living in a transitional housing facility. He stated that D.F. moved into his home after she was released from the facility, and stayed there for two weeks before she began contacting other men and using heroin.

{¶23} Riedel testified that on the weekend in question, D.F. contacted him and wanted to discuss their relationship and her desire to "get clean." Riedel stated that he made up his mind that he was "done with [their] relationship," and that he spent the majority of the weekend attempting to break up with D.F. Riedel further testified that he expressed his displeasure to D.F. about her living situation with Rowe because he believed Rowe was "promoting her prostitution and drug use."

{¶24} With respect to the injuries sustained to D.F.'s face, Riedel testified that D.F. accidently hit herself in the face while they were tussling over a cell phone she was using to facilitate her prostitution. Riedel stated that D.F. stuck her finger nail into his hand, which caused him to let go of her phone, and "she broke her own nose basically." Riedel stated that he immediately offered to take her to the hospital, but she refused medical assistance. Riedel further denied ever putting a gun to D.F.'s head. When questioned about the photographs depicting D.F.'s bruises, Riedel testified that he and D.F. both fell

down the stairs together after D.F. head-butted him while he was attempting to break up with her in a "civil way."

{¶25} Regarding the marijuana discovered in his home, Riedel testified that almost four months before the night of the incident, a friend had dropped the marijuana plants off for Riedel "to hold on to." He stated that all of the growing equipment also belonged to his friend. Riedel testified that in the months the plants were in his home, he did not water them or provide them access to sunlight. He stated that the plants were diseased and were not able to be smoked. However, Riedel later admitted during his cross-examination that he "cut up" the marijuana that was discovered in a plastic container in his basement. He further admitted that he had read a book about marijuana cultivation just before his friend gave him the marijuana plants.

{¶26} Riedel testified that he "had no idea" that the police were outside his home until several friends contacted him and informed him that his house was on the news. Riedel stated that he initially thought the police were there for someone else in his neighborhood. However, once he realized the police were there for him, he immediately went outside with D.F. where he was arrested. Riedel stated that he did not prevent D.F. from leaving his house that evening and denied any allegations that he caused her physical harm or was holding her hostage.

{¶27} At the conclusion of trial, the jury found Riedel guilty of domestic violence and illegal cultivation of marijuana. He was found not guilty of all other counts. At sentencing, the trial court imposed a one-year term of community control sanctions.

**{¶28}** Riedel now appeals from his convictions.

## II. Law and Analysis

### A. Motion to Suppress

**{¶29}** In his first assignment of error, Riedel argues the trial court erred by failing to grant his motion to suppress evidence seized as a result of the warrantless search of his home.

**{¶30}** This court reviews a decision on a suppression motion under a mixed standard of review. "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). Therefore, a reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accepting the facts as true, the reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Id*. An appellate court reviews the trial court's application of the law to its factual findings, however, based on a de novo standard of review. *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 100.

**{¶31}** The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches and seizures conducted outside of the

judicial process, without a warrant based on probable cause, are per se unreasonable, unless they come within one of a few well-established exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). If evidence is obtained through actions that violate an accused's Fourth Amendment rights, exclusion of the evidence at trial is mandated. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶32} One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to voluntary consent. *Schneckloth* at 219. When seeking to rely on the consent exception of the warrant requirement, the state must show by "clear and positive" evidence that the consent was "freely and voluntarily" given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). The United States Supreme Court has held that "whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth* at 227.

> Important factors in determining whether a consent was voluntary are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*State v. Washington*, 8th Dist. Cuyahoga No. 86370, 2006-Ohio-568, ¶ 20, citing *State v. Lattimore*, 10th Dist. Franklin No. 03AP-467, 2003-Ohio-6829.

{¶33} At the suppression hearing, Sergeant Ron Ross, of the Cleveland Police Department, testified that once Riedel was in police custody, he approached Riedel to seek his consent to secure and seize any evidence pertaining to the incident that occurred inside Riedel's home.

{¶34} During the suppression hearing, the state played video footage taken from Sergeant Ross's body camera, which "fairly and accurately depicts his interaction with [Riedel] that evening."   The video footage shows that Riedel initially told Sergeant Ross that he would not sign a consent to search form.   However, a short time later, Riedel asked Sergeant Ross to come back to talk about the consent to search.   Riedel expressed his concerns, and Sergeant Ross answered each of Riedel's questions about the consent to search form.   Sergeant Ross testified that he verbally read the terms of the consent to search form to Riedel and explained the implications of the form before Riedel signed it. Sergeant Ross testified that he witnessed Riedel sign and date the consent form before the detectives proceeded to conduct the search of the home.

{¶35} The consent form stated, in relevant part,

> I, Justin Reidel, having been informed of my Constitutional Rights not to have a search made of the premises herein after mentioned without a search warrant, and of my right to refuse to consent to such a search, hereby authorize Det. Fitzpatrick and/or Det. Lentz of the Cleveland Police Department to conduct a complete search of the premises that I own.   These officers or agents are authorized by me to take from my premises any property, papers, or material which they desire.   This written permission is being given by me to the above named persons voluntarily and without threats or promises of any kind.   I also understand that I will be given a receipt for any property taken.

{¶36} During his cross-examination, Sergeant Ross conceded that Riedel was under arrest at the time he signed the consent to search form, and that he and other members of his team had entered Riedel's home before the consent was given while the SWAT team was securing the residence. Sergeant Ross explained that he and the members of his team "were not searching for evidence at that point."

{¶37} Det. Fitzpatrick testified at the suppression hearing that once Riedel was taken into custody, he was arrested and placed into the back of a zone car. Det. Fitzpatrick testified that he had no recollection of whether or not he "Mirandized" Riedel, but that he subsequently had conversations with other officers and detectives on the scene who indicated that he had, in fact, Mirandized him at the scene.

{¶38} With respect to the consent to search obtained from Riedel, Det. Fitzpatrick testified that he was not directly involved, but understood that Sergeant Ross "talked to the defendant, walked away, then defendant called him back to the car" and signed the consent to search form. Det. Fitzpatrick characterized the interaction between the officers and Riedel as "conversational." He stated that the conversation was "low key" and did not involve "yelling."

{¶39} Riedel testified at the suppression hearing and admitted that he signed the consent to search form. However, Riedel testified that he initially told the detectives that "he wanted an attorney" and that he felt he "was coerced to sign [the consent to search form]." Riedel explained that he "was in fear of his life" and believed Sergeant Ross was "going to make it better for [him]" if he signed the form. Riedel further alleged that, at

some point, a detective wearing plain clothes "pulled [him] three houses down by himself, threw [him] on the back of a police car and said, 'sign this paper, I'm going to make it worse for you if you don't.'"

{¶40} At the conclusion of the suppression hearing, the trial court made the following findings:

> At its peak, there were 25 to 30 officers at Mr. Riedel's home in response to the stand off, approximately seven riflemen, uniformed officers, uniformed SWAT officers and countless police cars with lights flashing.
>
> The police presence and resulting show of force, which were present when Mr. Riedel made the decision to sign the consent form were there as a result of his own actions inside the home.
>
> The officers were not there to intimidate Mr. Riedel into signing a consent to search form. They were there in response to a situation he is alleged to have created. We also have the body camera footage of Sergeant Ron Ross, which was admitted during the hearing as State's Exhibit No. 2.
>
> The footage shows the Defendant handcuffed in the back seat of a police car where he was placed immediately after his exit from the home. Sergeant Ross explained the consent to search form. He also told Mr. Riedel that they were going to get a search warrant for the home regardless.
>
> Mr. Riedel asked a few questions and told Sergeant Ross that he would not sign, and Sergeant Ross walked away. A short time later the Defendant asked Sergeant Ross to come back to talk about the consent to search. What ensued was a cordial, casual conversation during which time Mr. Riedel expressed concern about his cat and what it actually meant to consent to the search of his home.
>
> Sergeant Ross answered Mr. Riedel's questions and read the consent form to him. Mr. Riedel acknowledged that it would be easier for the police officers and agreed to sign. Sergeant Ross removed him from the back of a police car, removed his handcuffs, and Mr. Riedel signed the form in the back of the car.

Viewing the body camera footage and the fact that Mr. Riedel asked Sergeant Ross to come back, to me shows that the State has met its burden of clear and positive evidence that Mr. Riedel voluntarily consented to the search of his home. I'm going to deny the Defendant's motion to suppress the results of the search of the home.

{¶41} On appeal, Riedel argues that the testimony presented at the suppression hearing demonstrates that "his consent to search his home was given under duress and was not voluntary when reviewed under the totality of the circumstances test."

{¶42} As stated, Riedel was under arrest when he signed the consent form. However, the fact of arrest does not necessarily render a consent involuntary. "The fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The question becomes whether the duress present in a particular case exceeds the normal duress inherent in any arrest. *State v. Simmons*, 61 Ohio App.3d 514, 573 N.E.2d 165 (9th Dist.1989).

{¶43} In light of the evidence presented at the suppression hearing, we find Riedel cannot prevail on his argument that he did not knowingly or voluntarily consent to have his home searched. The evidence clearly demonstrates that prior to signing the consent to search form, Sergeant Ross explained the rights Riedel was waiving and that he had the right to refuse consent. During the suppression hearing, Riedel acknowledged that he believed it would be in his best interests to consent to the search and that he signed the consent to search form presented to him. The fact that Riedel signed a written waiver is strong proof that the waiver was valid. *See State v. Jackson*, 5th Dist. Richland No.

2012-CA-20, 2012-Ohio-5548, ¶ 35 (determining that defendant's signing of a written consent form was "strong proof" that she voluntarily gave police officers consent to search a house).

{¶44} In an effort to demonstrate coercive police conduct, Riedel relies on the Sixth District's decision in *State v. Jackson*, 110 Ohio App.3d 137, 673 N.E.2d 685 (6th Dist.1996), for the proposition that once Riedel denied the detective's initial request for consent, the subsequent requests for consent began "to take on a coercive tone." *Id.* at 143.

{¶45} After careful review, we find no merit to Riedel's reliance on *Jackson*. Unlike the factual scenario presented in *Jackson*, Riedel was not subjected to an officer's continued pursuit for consent once the first request for permission to search was denied. Rather, the evidence presented at the suppression hearing demonstrates that it was Riedel who called Sergeant Ross back to further discuss the consent to search form after he had originally declined to sign the form. Both Riedel and Sergeant Ross stated that the conversation was "cordial" and that Riedel agreed to sign the consent form because he believed it was in his best interests to cooperate with the police. Sergeant Ross testified that he carefully explained the consent to search form to Riedel and advised him that he had the right to refuse consent. Thus, we find Sergeant Ross's interaction with Riedel in this case does not suggest a "coercive tone."

{¶46} We recognize that Riedel alleged at the suppression hearing, for the first time, that a detective "threw" him against a patrol car and threatened to make things worse

for him if he did not consent to the search. Clearly, such an act, if believed, would constitute coercion or duress. However, the evaluation of evidence and the credibility of the witnesses are issues for the trier of fact. Deferring to the trial court's assessment of the witnesses credibility, as we must, we are unable to conclude that the trial court erred by giving little weight to Riedel's allegations against the unidentified detective.

{¶47} Under the totality of the circumstances, we find there was competent, credible evidence presented at the suppression hearing to show that Riedel freely and voluntarily consented to the search when he signed the consent to search form. Accordingly, we find the trial court did not err by denying Riedel's motion to suppress evidence seized as a result of the detective's warrantless search of his home.

{¶48} We note that Riedel further argues on appeal that the trial court failed to consider whether the SWAT team's initial protective sweep of his home was unlawful and tainted Riedel's subsequent consent. However, our review of Riedel's motion to suppress, his supplemental motions, and the arguments raised at the suppression hearing reveals that this specific argument was not raised nor considered by the trial court. "It is well-settled law that issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived." *State v. Barrett*, 10th Dist. Franklin No. 11AP-375, 2011-Ohio-4986, ¶ 13. This waiver rule applies to arguments not asserted either in a written motion to suppress or at a suppression hearing. *See State v. Massingill*, 8th Dist. Cuyahoga No. 92813, 2009-Ohio-6221, ¶ 20 ("the failure to raise suppression claims in the trial court prior to the commencement of trial precludes raising

the argument for the first time on appeal."). Accordingly, Riedel waived this unlawful-protective-sweep argument for purposes of this appeal by failing to raise it in the trial court in any manner.

{¶49} Riedel's first assignment of error is overruled.

## B. Failure to Provide *Miranda* Warnings

{¶50} In his second assignment of error, Riedel argues "the trial court erred when it failed to suppress a written consent to search the home and evidence obtained thereof where Riedel was under arrest and had requested an attorney and the consent was obtained without providing *Miranda* warnings."

{¶51} The Fifth Amendment provides that "no person * * * shall be compelled in any criminal case to be a witness against himself." "The Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *Hiibel v. Sixth Judicial Dist. Ct. of Nevada, Humbolt Cty.*, 542 U.S. 177, 195, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), quoting *Kastigar v. United States*, 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

{¶52} In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that, in order to protect a defendant's right under the Fifth Amendment against compelled self-incrimination, before police initiate custodial interrogation, they must advise a defendant that, in addition to other rights, he has the right to remain silent and the right to counsel. *Id*. at 1624-1627. However, "[i]n order to

merit the protections of the Fifth Amendment privilege against self-incrimination, the evidence must be both 'compelled' by the state and of a 'testimonial' or 'communicative' nature." *Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

{¶53} In this case, Riedel asserts that Sergeant Ross's request for consent to search after Riedel had requested to speak to an attorney was an interrogation within the meaning of the Fifth Amendment. Riedel further contends that because *Miranda* warnings were not given to him prior to the search of his home, "he could not have voluntarily consented to the search of his home." After careful review, we find no merit to Riedel's position.

{¶54} This court has held that even after a suspect has invoked his right to counsel, the police are not prohibited from asking a suspect to consent to a search, as a request for consent to search is not an interrogation under *Miranda*. *State v. Bolton*, 8th Dist. Cuyahoga No. 96385, 2012-Ohio-169, ¶ 23, citing *United States v. LaGrone*, 43 F.3d 332 (7th Cir.1994). Moreover, the weight of authority in Ohio holds that prior *Miranda* warnings are not required to validate consent searches, even when the consent is obtained after the defendant is effectively in custody. *See State v. Lee*, 2d Dist. Greene No. 96 CA 115, 1997 Ohio App. LEXIS 4781 (Oct. 31, 1997); *State v. Clelland*, 83 Ohio App.3d 474, 615 N.E.2d 276 (4th Dist.1992); *State v. Frank*, 2d Dist. Montgomery No. 18977, 2002 Ohio App. LEXIS 1884 (Apr. 19, 2002); *State v. Tobias*, 2d Dist. Montgomery No. 17975, 2000 Ohio App. LEXIS 4158 (Sept. 15, 2000); *State v. Frazier*, 3d Dist. Shelby Nos. 17-11-06 and 17-11-07, 2013-Ohio-142.

However one interprets *Miranda*, what becomes subject to exclusion when a warning is not given although the situation calls for one, are "statements, whether exculpatory or inculpatory, stemming from custodial interrogation." A consent to search, as such, is neither testimonial, nor communicative in the Fifth Amendment sense. *Miranda* warnings are intended to inform a suspect of his or her rights prior to making statements to the police and have no direct bearing on the decision to consent to a search.

*Lee* at 14, citing 3 LaFave, *Search and Seizure,* Section 8.2(j), at 691 (1996).

**{¶55}** Accordingly, the absence of *Miranda* warnings after the arrest and prior to the search did not invalidate Riedel's consent to search his home. *See Clelland*. Having previously determined that Riedel's consent was voluntary, we find the failure to give *Miranda* warnings does not require suppression of the "fruit" of an otherwise valid consensual search.

**{¶56}** Riedel's second assignment of error is overruled.

### C. Jury Instructions

**{¶57}** In his third assignment of error, Riedel argues the trial court committed plain error when it gave a defective jury instruction for domestic violence.

**{¶58}** As an initial matter, we note that Riedel did not object to the challenged jury instruction and has waived all but plain error. Crim.R. 52; *State v. Long*, 53 Ohio St.2d 91, 94, 372 N.E.2d 804 (1978). An erroneous jury instruction does not rise to the level of plain error unless it is clear that absent the error, the jury's verdict would have been different. *State v. Williams*, 8th Dist. Cuyahoga No. 94616, 2011-Ohio-925, ¶ 36. Notice of plain error "is to be taken with the utmost caution, under exceptional

circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus; Crim.R. 52(B).

{¶59} In this case, the trial court gave the jury the following instruction on domestic violence:

> Before you can find the defendant guilty of domestic violence, you must find beyond a reasonable doubt that on or about the 24th day of January 2016, in Cuyahoga County, Ohio, the defendant did knowingly cause or attempt to cause physical harm to [D.F.], a family or household member.
>
> * * *
>
> A family or household member means, a person who is residing with the defendant, or has resided with the defendant *and/or* is the spouse of, or person living as the spouse of or former spouse of * * * the defendant.
>
> * * *
>
> Reside means to live in a place for an extended period of time.

(Emphasis added.)

{¶60} Riedel argues that the trial court's instruction to the jury concerning the definition of a "household member" was defective and inconsistent with the language set forth in R.C. 2919.25(F). Relevant to the arguments raised in this assignment of error, R.C. 2919.25(F) states:

> (1) "Family or household member" means any of the following:
>
> (a) Any of the following who is residing or has resided with the offender:
>
> (i) A spouse, a person living as a spouse, or a former spouse of the offender * * *.

{¶61} Riedel contends that by improperly using the phrase "and/or" where the statute does not, the trial court improperly modified the term "household member" to include someone who "has resided with the defendant" *or* is the spouse, person living as the spouse, or former spouse of the defendant. (Emphasis added.) In other words, Riedel claims that the trial court "changed the elements of the offense" and permitted the jury to find him guilty of domestic violence so long as they found D.F. resided with him, without consideration of whether she was a "person living as a spouse."

{¶62} After careful review of the record, we agree that the trial court provided a defective instruction on the definition of household member. However, we do not find that a manifest miscarriage of justice occurred in this case. Here, the record reflects that upon instructing the jury in open court, the trial court informed the jury that it would provide it with "the exhibits, verdict forms, and the special instructions of law in this case" for their review in the jury room. The trial court encouraged the jury to review the written jury instructions and, if it had any questions about the instructions, it was required to "discuss it in the privacy of the jury room." The court further advised the jury that if there was a disagreement "as to the meaning of these instructions," it was "possible to review those matters by a request to the Court."

{¶63} In this case, the written jury instructions submitted to the jury contained the proper definition of "household member" as defined by R.C. 2919.25(F). Moreover, the jury verdict form stated, in relevant part:

> [W]e, the jury in this case, being duly impaneled and sworn, do find the defendant, Justin Riedel, guilty of domestic violence, in violation of

2919.25(A) of the Ohio Revised Code as charged in Count 4 of the indictment.

Thus, the jury verdict form referred to the indictment, which also included the proper definition of "household member."

**{¶64}** Under these circumstances, it appears the jury considered, and ultimately determined, that D.F. (1) had resided with Riedel, *and* (2) was "a person living as a spouse." *See State v. Daley,* 3d Dist. Seneca No. 13-13-26, 2014-Ohio-2128. The jury was provided with the correct definition of household member in both the written instructions and the jury verdict forms utilized during the jury's deliberations. While the challenged instruction contained a misstatement, we are unable to conclude that the outcome of the trial clearly would have been different had a proper instruction been given. Accordingly, we find the trial court's jury instruction on domestic violence did not rise to the level of plain error.

**{¶65}** Riedel's third assignment of error is overruled.

### D. Effective Assistance of Counsel

**{¶66}** In his fourth assignment of error, Riedel argues he was denied effective assistance of counsel when trial counsel failed to object to the trial court's instruction on the elements of domestic violence.

**{¶67}** To establish ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonable representation, and (2) that he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is

established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶68} The failure to prove either prong of the *Strickland* two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000). "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Strickland* at 697.

{¶69} Having previously determined that the outcome of the trial would not have been different had a proper instruction been given, we find Riedel was not prejudiced by defense counsel's failure to object to the trial court's domestic violence instruction.

{¶70} Riedel's fourth assignment of error is overruled.

### E. Sufficiency of the Evidence

{¶71} In his fifth assignment of error, Riedel argues "the trial court erred by denying his Crim.R. 29 motion for acquittal and thereafter finding him guilty of domestic violence and illegal cultivation of marijuana where there was insufficient evidence to support those findings."

{¶72} A Crim.R. 29 motion challenges the sufficiency of the evidence. When considering a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶73} The state may use direct evidence, circumstantial evidence, or both, in order to establish the elements of a crime. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence is "proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, ¶ 32, citing *State v. Beynum*, 8th Dist. Cuyahoga No. 69206, 1996 Ohio App. LEXIS 2143 (May 23, 1996); *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37.

{¶74} Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks* at paragraph one of the syllabus. "[A]ll that is required of the

jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Id*. at 272. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc*., 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). And circumstantial evidence alone is sufficient to support a conviction. *State v. Coleman*, 8th Dist. Cuyahoga No. 102966, 2016-Ohio-297, ¶ 22.

### 1. Illegal Cultivation

**{¶75}** In this case, Riedel was convicted of illegal cultivation of marijuana in violation of R.C. 2925.04(A). The statute provides that "[n]o person shall knowingly cultivate marijuana or knowingly manufacture or otherwise engage in any part of the production of a controlled substance."

**{¶76}** R.C. 2901.22(B) sets forth the definition of "knowingly," stating:

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

Pursuant to R.C. 2925.01(F), the term "cultivate" includes acts of "planting, watering, fertilizing, or tilling." R.C. 2925.01(F).

**{¶77}** On appeal, Riedel argues that "the evidence offered at trial was insufficient to establish that he knowingly cultivated marijuana." We disagree. At trial, Det.

Robinson identified state's exhibit Nos. 1.17-1.24 as photographs he took inside Riedel's home on the night of the incident. Det. Robinson testified that a total of "six different strands of marijuana" were discovered in Riedel's basement and bedroom. The photographs of the discovered marijuana depict potted plants in various stages of maturity and growth, a 13-gallon garbage bag full of marijuana cuttings, "dried" marijuana that was stored in a plastic container, and marijuana strands that were hung to dry from the basement rafters. Det. Staimpel testified that while some of the marijuana was "dried to the point that * * * it was blowing all over the house," some of the plants were "fresh" or "mature." The photograph of the potted marijuana plants reflects that the plants were positioned under a "Growstone" grow light and next to a nearby circulating fan. The total weight of the marijuana seized from Riedel's home was approximately 1,177 grams. Based on the foregoing evidence, Det. Staimpel testified that the marijuana and related equipment discovered inside Riedel's home was "consistent with a growth operation."

{¶78} Viewing this evidence in a light most favorable to the state, we find a reasonable trier-of-fact could find beyond a reasonable doubt that Riedel knowingly cultivated marijuana. Although the state was unable to present direct evidence of specific acts of cultivation, there was sufficient circumstantial evidence "from which the trier of fact could infer or derive by reasoning," that Riedel planted, watered, fertilized, or tilled the marijuana discovered inside his home.

## 2. Domestic Violence

{¶79} Riedel was further convicted of domestic violence in violation of R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2901.01(A)(3) defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶80} As previously discussed, R.C. 2919.25(F)(1)(a)(i) defines "family or household member" as a spouse, a person living as a spouse, or a former spouse of the offender, who is residing with or has resided with the offender.

{¶81} A "person living as a spouse" includes "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise *has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.*" (Emphasis added.) R.C. 2919.25(F)(2).

{¶82} On appeal, Riedel does not challenge the sufficiency of the evidence going to the element of physical harm. However, he contends that there was insufficient evidence to support his domestic violence conviction because the state failed to demonstrate that D.F. was a "person living as a spouse." He contends that the state presented no evidence that D.F. had " cohabited with [him] within five years prior to the date of the alleged [incident]."

{¶83} In *State v. Williams*, 79 Ohio St.3d 459, 465, 683 N.E.2d 1126 (1997), the Ohio Supreme Court addressed the definition of "cohabitation" as follows:

[W]e conclude that the essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium. R.C. 2919.25(E)(2) and related statutes. Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.

{¶84} In *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15, the Ohio Supreme Court clarified its definition of cohabitation, finding that when the defendant and the victim share the same residence, the state does not have to prove cohabitation through evidence of financial or familial responsibilities and consortium. *Id.*

{¶85} With respect to the factual scenario presented in this case, it is important to note that "the prosecution is only required to prove the elements set forth in the domestic violence statute." *Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 100662, 2014-Ohio-4083, ¶ 14. As the Supreme Court acknowledged in *McGlothan*, the legislature intended "'to protect persons from violence by close family members or residents of the same household' and 'to offer protections to a wide class of persons.'" *McGlothan* at ¶ 17, quoting *State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, ¶ 32, 36. In furtherance of this legislative intent, the General Assembly extended the protections afforded under R.C. 2919.25(A) to victims who have cohabited with the defendant "within five years prior to the date of the commission of the act in question."

**{¶86}** In this case, D.F. testified that she lived with Riedel as boyfriend and girlfriend for "several months" in 2013. Although Riedel and D.F. were not cohabiting at the time of the assault, there was sufficient evidence that they shared a residence within five years of the incident, and therefore, had cohabited within the five-year period provided for in the statute. *See Johnson* at ¶ 14 (finding that the victim, who was not presently cohabiting with defendant at the time of the assault, was a person "living as a spouse" and a household member" where the evidence showed that the victim had previously lived with the defendant for two years within the five-year period provided under R.C. 2919.25(F)(2)). Because there was evidence that Riedel and D.F. had lived together, the state was not required to prove cohabitation through evidence of financial or familial responsibilities and consortium. *Id.,* citing *McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, at ¶ 15.

**{¶87}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that D.F. was a household member and that Riedel knowingly caused her physical harm. We hold, therefore, that the state met its burden of production regarding each element of the crime of domestic violence.

**{¶88}** Based on the foregoing, we find Riedel's illegal cultivation of marijuana and domestic violence convictions were supported by sufficient evidence. The trial court did not err by denying Riedel's Crim.R. 29 motion for acquittal.

**{¶89}** Riedel's fifth assignment of error is overruled.

## F. Manifest Weight of the Evidence

**{¶90}** In his sixth assignment of error, Riedel argues his convictions were against the manifest weight of the evidence.

**{¶91}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins,* 78 Ohio St.3d at 388, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id*.

**{¶92}** Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies

and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶93} In challenging the weight of the evidence supporting his illegal cultivation of marijuana conviction, Riedel argues that the evidence presented at trial supported his position that the marijuana plants discovered in his home were dropped off by a friend. He contends that he took no action to cultivate the marijuana.

{¶94} With respect to his domestic violence conviction, Riedel asserts that the allegations raised by D.F. were not credible. Riedel notes that the evidence presented at trial demonstrated that D.F. "was engaged in working as a prostitute and was heavily addicted to opiates." Moreover, he argues that the "minimal" injuries to her face were not consistent with her testimony that Riedel "punched her with a closed fist over and over again." Instead, Riedel suggests that "it is more probable that both D.F. and Riedel were injured while tussling over a phone which D.F. was using to attempt to prostitute herself and then falling down the stairs."

{¶95} After reviewing the record, we cannot say that this is the exceptional case in which the trial court clearly lost its way and created such a manifest miscarriage of justice that Riedel's conviction must be reversed and a new trial ordered. The jury, as the trier of fact, was in the best position to weigh the credibility of the witnesses and was free to reject Riedel's contention that the growth operation discovered in his basement and personal bedroom was brought there by his friend and that he had no involvement in the

cultivation of the 1,177 grams marijuana found in his home. Furthermore, the jury was free to give substantial weight to D.F.'s testimony that Riedel repeatedly struck her in the face with a closed fist and threw her down stairs despite her past criminal activity and drug use. The state presented ample evidence of D.F.'s injuries, including photographs of her broken nose and the bruises found on her arms, knee, and shoulder.

**{¶96}** In short, Riedel's convictions are not against the manifest weight of the evidence simply because the trial court chose to believe the state's version of the events rather than Riedel's theory. *See State v. Nelson*, 8th Dist. Cuyahoga No. 104336, 2017-Ohio-5568, ¶ 58. Accordingly, Riedel's convictions are not against the manifest weight of the evidence.

**{¶97}** Riedel's sixth assignment of error is overruled.

**{¶98}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

TIM McCORMACK, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR