The STATE of Ohio, Appellant,

v.

FOSTER, Appellee.

[Cite as *State v. Foster* (1993), 87 Ohio App.3d 32.]

Court of Appeals of Ohio,
Miami County.

No. 9239.

Decided April 6, 1993.

*James D. Bennett,* for appellant.

*Frank S. Virzi,* for appellee.

FREDERICK N. YOUNG, Judge.

The state of Ohio appeals pursuant to R.C. 2945.67(A) and Crim.R. 12(J), from a pretrial order of the Common Pleas Court of Miami County, Ohio, which suppressed evidence gained from a search of an automobile.

On March 4, 1992, Nathaniel D. Foster, appellee, and Willie Davis, a passenger in the car appellee had been driving, were indicted for one count of aggravated trafficking, R.C. 2925.03(A)(9), and carrying a concealed weapon, R.C. 2923.12(A). A motion to suppress evidence which had been found in the automobile appellee had been driving was filed on May 27, 1992, and a full hearing was held on this motion on June 19, 1992. On August 25, 1992, the trial court sustained the appellee's motion, finding as follows:

"1. The stopping officer had specific and articulable facts to reasonably justify the traffic-violation stop. *State v. Chatton* (1984), 11 Ohio St.3d 59 [11 OBR 250, 463 N.E.2d 1237]; *Berkemer v. McCarthy [McCarty ]* (1984), 468 U.S. 420 [104 S.Ct. 3138, 82 L.Ed.2d 317].

"2. The stopping officer lacked specific and articulable facts to reasonably justify detaining Mr. Foster after he had been issued the defect notification. *Florida v. Royer* (1983), 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229]; *State v. Hart* (1988), 61 Ohio App.3d 37 [572 N.E.2d 141]; *State v. Chatton* (1984), 11 Ohio St.3d 59 [11 OBR 250, 463 N.E.2d 1237]; *Columbus v. Watson* (1989), 64 Ohio App.3d 6 [580 N.E.2d 494].

"3. The consent to search was tainted by the illegal detention; and, in addition, the totality of the circumstances surrounding the consent fails to show that it was intelligently, freely, and voluntarily given. *Bumper v. North Carolina* (1968), 391 U.S. 543 [88 S.Ct. 1788, 20 L.Ed.2d 797]; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218 [93 S.Ct. 2041, 36 L.Ed.2d 854]; *State v. Childress* (1983), 4 Ohio St.3d 217 [4 OBR 534, 448 N.E.2d 155]; *Florida v. Royer* (1983), 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229].

"Having found that the further detention of the Defendant and the 'consent search' were invalid, the motion to suppress is found to be well taken and the same is, therefore, sustained. *Brown v. Illinois* [ (1975), 422 U.S. 590, 95 S.Ct. 2254], 45 L.Ed.2d 46 [416]."

The state appeals from this decision and presents us with one assignment of error:

## Assignment of Error

"The trial court erred in granting defendant's motion to suppress evidence because the Highway Patrol obtained a valid consent to search the defendant's vehicle."

## I

On the evening of February 11, 1992, appellee was driving south on Interstate 75 in a 1987 Buick Riviera automobile registered in the name of Gerald A. Parks of Detroit, Michigan, with his passenger, Willie Davis. Both men were traveling from Detroit, Michigan.

That night Sgt. Gurwell of the Springfield Post of the Ohio State Highway Patrol, together with two other Highway Patrol officers, was working a drug interdiction program on Interstate 75 in Miami County, Ohio. At approximately 10:30 p.m., he noticed appellee's car apparently exceeding the speed limit, but he was unable to get a radar reading on the car. Sgt. Gurwell was heading north and, as the two automobiles passed, the sergeant noted that the license plate light in appellee's car was not working. The sergeant turned around and made a traffic stop of the appellee.

The sergeant walked over to the appellee's car and ordered the appellee to leave the car and come back to the sergeant's patrol car. Davis stayed in the Buick. While at the driver's side of appellee's car, Sgt. Gurwell noted some fast-food wrappers inside the car, a toggle switch and loose wires hanging under the dash, a disconnected radar detector in the back seat, and some missing interior trim. Back in the patrol car, he determined by radio telephone the proper owner of the car appellee was driving and ascertained that it had not been listed as stolen and that there were no warrants for the arrest of the appellee, who was a properly licensed and insured driver.

Sgt. Gurwell then wrote out and issued the appellee a defect notification for the license plate violation. Then while in the patrol car, the sergeant began to question the appellee about his destination and reason for travel. The appellee stated that he was going to a funeral in Alabama but admitted that he did not know who the deceased was, when the funeral was, or exactly where the funeral was.

The following is from the transcript of the cross-examination of Sgt. Gurwell at the suppression hearing:

"Q. Okay, the rest of the conversation you had with him had nothing to do with this equipment violation, did it? For example, I mean where he was going had nothing to do with the violation for which you were stopping him?

"A. Right.

"Q. Isn't that so?

"A. Right.

"Q. And were you asking him to be nosy or why?

"A. I was asking him because that's what I'm paid by the State of Ohio to do.

"Q. Just to stop drivers and ask them where they are going?

"A. Well, be inquisitive.

"Q. So you're just being generally inquisitive?

"A. Yes sir.

"Q. And he didn't tell you anything that led you to believe that where he was going would—had anything criminal involved with it, isn't that so?

"A. Other than he was very evasive and I felt he was not telling me the truth about where he was going.

"Q. Okay. Well, being evasive is not against the law, is it?

"A. No sir.

"Q. And lying to you is not against the law either?

"A. Not for that, no sir.

"Q. I think you said in your report that you then decided to search the car based upon statements given by the driver.

"A. Okay, yes sir.

"Q. That's in your report?

"A. Yes sir."

The passenger, Davis, later gave a different reason for his travel south, but that was not known to Sgt. Gurwell at the time and had nothing to do with his decision to search the car.

After about ten or fifteen minutes of this questioning, Sgt. Gurwell testified that he told the appellee he was free to go, but this statement is contradicted by the testimony of the appellee himself.

The sergeant then asked the appellee if he could search the appellee's car. The sergeant testified that he handed the appellee the standard Highway Patrol's consent-to-search form, which the sergeant himself filled out. The sergeant testified that he read to the appellee the waiver at the bottom of the form, which states: "I understand that I have the right to refuse the search described above and refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind have been used against me to obtain consent to this search or to sign this form." The appellee apparently did sign the form and his signature is witnessed by another highway patrolman, who by this time had arrived at the scene also.

The appellee's version of this encounter regarding the consent form is as follows:

"Q. Okay, prior to your signing that document, did you have any discussion or conversation with Sergeant Gurwell?

"A. Yes.

"Q. Could you tell us what that conversation was?

"A. It was about the tail light defection was—mostly about the tail light defection, you know, and he was writing this out while he was—while we was talkin', and he was wantin' to know where I was goin'.

"Q. Could you speak up a little bit?

"A. He wanted to know where I was goin'.

"Q. All right, did he ask you to sign that consent?

"A. Yes.

"Q. Did he indicate to you whether you had any options to sign that consent?

"A. Yes, he—he said that—well, I asked him because I didn't want—I'm sayin' that first I asked him about it, did I have to sign consent, and he said that he—that I—I asked him what was my options, and he said if I didn't sign the consent, then he would have to—he—well, he—they could either call the dogs out there or they can tow it into the station because the registration—I had the registration and insurance to the car, but he was threatenin' me with stolen car, you know.

"Q. Uh-huh.

"A. Which he found out that it weren't stolen, you know, and he was sayin', you know, he can tow the car in or he can bring the dog out. It would take—take him long—take me longer for me to do this than let him go over the car in two minutes. He said he'd run over the car in two minutes and we'd be gone.

"Q. So he—did he—he indicated then that if you consented to that, you could be gone in a couple of minutes?

"A. Yes.

"Q. Did he tell you prior to asking you to sign the consent that you would be free to go without signing the consent?

"A. Did he tell me prior to that I was—

"Q. Prior to signing the consent, did he state that you could leave without signing a consent?

"A. No, he never stated that.

"Q. Did he at any time tell you that you were free to go?

"A. No.

"* * *

"Q. So Sergeant Gurwell did not tell you that you could leave?

"A. No.

"Q. After you signed the consent, did he say you could leave?

"A. No.

"Q. And he indicated to you then that unless you signed the consent you'd have to wait there two hours for the dogs to come?

"A. Well, I—he told me this was the options, you know, that I had, you know, either let him search the car, you know, 'cause I understand it right away 'cause, you know, he read it to me. And then I asked him did I have to sign it, you know, and he never did read the bottom part to me, you know. And he read it— he never said this was the consent form for me to sign to search the car. He never did read the bottom part to me.

"Q. All right, so you're saying that he did not read—

"A. No, you know, that—

"Q. —the consent to you?

"A. No, he never said that I had the right to refuse it. I said, well, do I have an option, you know, to—You know, do I have to, you know, let you do this, and he said, well, you do this like this or we do it this way. So, you know, I had to do it the way he wanted it did, you know * * *.

"* * *

"Q. And he just simply told you that if you signed that, that he would search the car and take couple minutes and you could be on your way?

"A. Yes.

"Q. The other option was we could tow the car in and have it searched or have some dogs search the car?

"A. Uh-huh.

"Q. This that [sic] the other option?

"A. Right.

"Q. And he didn't give you a third option of saying you didn't have to do either of the foregoing, you can be on your way?

"A. No, he didn't say that.

"Q. Okay.

"A. No, 'cause he never said—he never read the bottom of it sayin' that I could refuse, you know, for him to search. He never read that to me.

"Q. And in that context you signed?

"A. Yes, I just—you know, I signed it because I was ready to go and he said it only takes—it's only gonna take two minutes for him to run through the car, you know. So I signed it, you know, instead of waitin' out there for two hours, which he said anyway, you know.

"Q. So you signed it for two reasons; one, you didn't have anything to hide as far as you were concerned?

"A. Right.

"Q. And two, you thought they were gonna search the car anyway—

"A. Uh-huh.

"Q. —and it was a matter of whether he did it then or they searched it later, is that a fair appraisal?

"A.  Right.

"Q.  But you didn't know that you could just say, 'Look, I'm out of here'?

"A.  I didn't know that.

"*      *      *

"Q.  All right, and then he said you don't have to sign it, but if you don't, you're gonna be here for a couple of hours 'cause I'm gonna call in some dogs?

"A.  I asked him, I say if—I say, 'What if I don't sign it?'  I say, 'What if I don't sign it?'  That what I asked him.  What if I don't sign it, and he say well, I get—I get three options.  He say you get—well, he said you got three options.  He said you can either sign it, let me search it, or I can call the dogs out, or I can tow it into the station.  This is what he told me.

"Q.  All right, and so then you opted to sign it?

"A.  Yeah, I wanted to sign it.

"Q.  All right.  Now, 'cause he said it would only take two minutes?

"A.  That was—yeah, that was basically the reason I signed, you know, so fast, you know, because he said that it was only gonna take two minutes.  I would have probably read it, you know."

The sergeant then proceeded to search the car and found approximately two thousand grams of cocaine.  The patrol also found a gun in the car after they had towed it back to the Highway Patrol post.  In addition, a minute quantity of marijuana was found on passenger Davis.  Both the appellee and passenger Davis were then arrested and were read their *Miranda* rights and taken back to the Piqua post of the Ohio State Highway Patrol where written statements were taken from each.

The sergeant testified at the suppression hearing that it was the things that he had seen in the car, namely some loose wires under the dash, a toggle switch, an unconnected radar detector, fast-food wrappers and some missing trim pieces in the interior, that had aroused his suspicion.  He testified that while each one of these items could be consistent with a drug violation, they were also consistent with purely innocent behavior.  For example, as to the fast-food wrappers, he testified that this is consistent with a drug violation because "people don't want to leave the vehicle for any reason."  He further testified that it was suspicious that the vehicle was traveling from Detroit, which "is a source city for cocaine."

## II

There is no issue here about the initial traffic stop.  The stopping officer obviously had reasonable cause, based upon his own observation of the missing

light on the license plate, to stop the car and issue its driver a defect-notification form.

■ In order to continue holding the appellee and initiating a valid search of his vehicle, the stopping officer must have "specific and articulable facts that further detention was reasonable." *State v. Hart* (1988), 61 Ohio App.3d 37, 41, 572 N.E.2d 141, 144; see, also, *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237, "in which the Ohio Supreme Court held that a police officer, who detained an individual for a suspected traffic violation, does not have authority to further detain that individual to determine the validity of his driver's license once the officer no longer has reason to suspect that individual is committing a traffic violation, absent some specific and articulable facts that detention was reasonable." *State v. Hart, supra,* 61 Ohio App.3d at 41, 572 N.E.2d at 144.

The state attempts to distinguish *Chatton* on the grounds that there the officer detained the defendant beyond a reasonable time after he had ascertained that the initial reason for the stop was no longer in issue.

*Chatton* is very much on point, however, since the question both here and in *Chatton* was, did the stopping officer have specific and articulable facts to reasonably justify detaining the driver of the vehicle after the issue which led to the stop had been resolved? In this case, the resolution was the issuance of the defect notification to the appellee.

■ The evidence shows that here the stopping officer detained the appellee in the patrol car for ten or fifteen minutes, during which he inquired in detail as to the appellee's destination and reasons for the trip. The appellee's vague and less than definitive answers undoubtedly fueled the officer's suspicions, but as this court stated in *State v. Carter* (Feb. 4, 1993), Montgomery App. No. 13628, unreported at 15, 1993 WL 24777, in an opinion by Judge Brogan: "An officer's inarticulate hunch will not provide a sufficient basis for an investigative stop."

■ The only other facts the officer mentioned as grounds for his search were the hanging toggle switch, the loose fast-food wrappers, the unconnected radar detector, and some missing trim in the interior of the car. These may be articulable facts but they certainly do not provide reasonable grounds for conducting the search. If fast-food wrappers and a radar detector in a vehicle can justify a search of it, then we are all at risk.

What we have here, obviously, is a so-called "profile case" where an investigating officer notes some facts which are among a number of indicia often found in the profile of a typical drug courier or dealer. If the facts cited by the officer in this case are sufficient grounds to justify a search of the vehicle, then any late-model car being driven from Detroit by one or two young men, with a radar

detector, some fast-food wrappers, and a hanging toggle switch in it, together with a little bit of missing trim, is subject to a stop-and-search action. The net would be cast too far in such a case. A small set of individual facts, each one innocent in itself, does not necessarily add up to reasonable grounds for a search when taken together, at least under the circumstances of this case.

We agree with the trial court that the stopping officer indeed lacked specific and articulable facts to reasonably justify detaining the appellee after the defect notification had been issued. *Columbus v. Watson* (1989), 64 Ohio App.3d 6, 580 N.E.2d 494.

■ The state of course would validate this search on the grounds that a valid consent was obtained for it. It is settled law that where the validity of a search rests on consent, the state has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854.

In *Schneckloth* the United States Supreme Court dealt at length with the issue of the voluntariness of a consent and held that the question of whether a consent to a search is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. The court there stated:

"But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

"\*     \*     \*

"In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.' " *Id.* at 228–229, 93 S.Ct. at 2048–2049, 36 L.Ed.2d at 863–864.

■ In the case at hand, there is sufficient testimony in the record, if believed, to support the conclusion that the appellee felt himself constrained to sign the consent form in the expectation that by doing so he would be back on the

road and free again in just a few minutes. He was led to believe, apparently, that if he did not sign, the Highway Patrol would conduct a search anyway, after a wait of about two hours, whether or not dogs were involved. There was also sufficient testimony, if believed, to support the conclusion that the appellee did not feel that he was free to go and was in a subtly threatening situation. Credibility of witnesses is in the domain of the trial court. We shall not and should not attempt to second-guess it. The trial court found that the state did not meet its burden of proving that the consent to search was intelligently, freely and voluntarily given. *Bumper v. North Carolina* (1968), 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; *Florida v. Royer, supra.*

The state cites for authority to justify its search in this case the decision of the Ohio Supreme Court in *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640. The facts in *Comen,* however, do not indicate the same kind of subtly coercive situation which the trial court found in the case at hand. In the *Comen* case, moreover, the police found several specific and articulable facts which would more than reasonably justify the stop and search there.

*Florida v. Jimeno* (1991), 500 U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297, also relied upon by the state, was not a case concerning validity of consent but rather focused on the reasonableness of the scope of consent. The question there was whether the freely given consent conferred a right on the searching officer to open a closed container found in the car.

*State v. Cooper* (1989), 61 Ohio App.3d 344, 572 N.E.2d 790, also cited by the state, merely involved an officer stopping the defendant and asking for his identity and some identification. Clearly, that is not a violation of an individual's Fourth Amendment rights and has no bearing on the case at hand.

Finally, the state refers to *State v. Moon* (Feb. 14, 1986), Montgomery App. No. 9288, unreported, 1986 WL 2368, where this court found a voluntary consent was freely given. But there the holding by this court was supported by *uncontradicted* testimony by the police officer in the trial court. That is certainly not the situation with the present case, and we repeat that the resolution of conflicts in testimony is a matter of credibility and for the trial court to determine.

We are extremely sympathetic and in complete support of the often heroic efforts by our law enforcement officials to stem and if possible turn back the tide of illicit drugs which seems to be flooding our streets and neighborhoods, but, as the United States Supreme Court recently stated in *Florida v. Bostick* (1991), 501 U.S. ——, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389, 401, we are "not empowered to suspend constitutional guarantees so that the Government may more effectively wage a 'war on drugs.' * * * If that war is to be fought, those

who fight must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime."

We reject the assignment of error and affirm the judgment of the trial court.

*Judgment affirmed.*

GRADY, P.J., and WOLFF, J., concur.