[Cite as *State v. Mathis*, 2019-Ohio-4887.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 107986 |
| v. | : | |
| JASMINE L. MATHIS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 27, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-620952-B

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Schnatter, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Robert McCaleb, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, P.J.:

**{¶ 1}** Defendant-appellant, Jasmine L. Mathis ("Mathis"), appeals the trial court's denial of her motion to suppress and her conviction for tampering with evidence. She raises two assignments of error for our appeal:

1. The trial court erred when it denied Ms. Mathis's motion to suppress on the grounds that she consented to the warrantless search of her cellular telephone.

2. Ms. Mathis was convicted on insufficient evidence because the government failed to prove mens rea.

**{¶ 2}** Finding no merit to her assignments of error, we affirm.

## I. Procedural History and Factual Background

**{¶ 3}** On September 8, 2017, the Cuyahoga County Grand Jury indicted Mathis for one count of obstructing justice in violation of R.C. 2921.32(A)(5), a felony of the third degree, and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree, with a one-year firearm specification.

**{¶ 4}** Mathis was indicted along with two codefendants, Terry Thomas, Jr. ("Thomas"),[1] and Kurtis Fields ("Fields"), for the shooting death of Tyrone Rodgers. Both Thomas and Fields were charged with one count of aggravated murder in violation of R.C. 2903.01(A), an undefined felony; one count of murder in violation

---

[1] In Cuyahoga C.P. No. CR-17-620952-A, Thomas agreed to a plea deal in September 2018 and pleaded guilty to an amended count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree, and carrying concealed weapons, and the remaining counts were nolled. Thomas filed a notice of appeal, but voluntarily dismissed it in February 2019.

of R.C. 2903.02(B), an undefined felony; two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2), felonies of the second degree; and one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a felony of the fourth degree. The aggravated murder, murder, and felonious-assault counts all carried firearm specifications. Additionally, Fields was charged with two counts of having weapons while under a disability in violation of R.C. 2923.13(A)(2) and (3) (one of which carried one- and three-year firearm specifications), and his counts for aggravated murder, murder, and felonious assault also carried notices of prior conviction and repeat violent offender specifications. [2]

{¶ 5} In January 2018, Mathis filed a motion to suppress her statements and evidence collected from her cell phone, arguing that (1) she and her phone were illegally seized and searched, (2) she did not voluntarily consent to the search of her phone, (3) the officer's pat down was illegal, and (4) officers failed to advise her of *Miranda* warnings. The state opposed her motion.

{¶ 6} The court held a hearing on the motion, during which the following evidence was presented.

{¶ 7} On February 26, 2015, at around approximately 10 p.m., officers responded to an apartment complex for a report of a shooting. When they arrived,

---

[2] In Cuyahoga C.P. No. CR-17-620952-C, Fields went to trial and the jury found him not guilty of aggravated murder and carrying concealed weapons, but guilty of the remaining counts of murder, felonious assault, and some of the firearm specifications. The trial court found Fields guilty of both counts of having weapons while under a disability. He appealed. *See State v. Fields,* 8th Dist. Cuyahoga No. 107971. Fields's appeal is a companion case to the instant case.

they found Rodgers bleeding from gunshot wounds at the bottom of a stairwell leading down to the first floor. After Rodgers was transported by EMS, Officer Vasile Nan ("Officer Nan") spoke with residents in the building and "determined the argument [that] led to the shooting occurred in or around Apartment 102." After a period of knocking, Mathis answered the door, and there were five to six adults in the apartment and a number of small children. Officer Nan did not enter the apartment and "stayed pretty much by the door." Mathis told him that she did not know Rodgers, but that her sister "was being followed prior to the incident from the rapid station on West 98th and Detroit to this location * * * by [Rodgers]." Mathis said that Rodgers followed her sister and came into Mathis's apartment, there was an argument between her sister and Rodgers, and Rodgers eventually left. Mathis told him that after Rodgers left her apartment, Mathis let two males, later identified as Thomas and Fields, into the building and that "almost immediately[,] an argument erupted between the * * * two unknown males, and the victim" and, shortly after, she heard gunshots. Mathis denied knowing Thomas and Fields and denied that they came into her apartment.

{¶ 8} After his 15-minute discussion with Mathis and while still on scene, Officer Nan viewed the security footage of the first-floor hallway showing that Thomas and Fields entered Mathis's apartment about 10 to 15 seconds before the shooting, which was inconsistent with Mathis's account.

{¶ 9} Upon finding that Mathis gave an account inconsistent with the security footage, Officer Nan and two to three other officers talked to Mathis again,

asking her to step into the hallway to talk. Mathis stood in the doorway, and the officers stood around her because the hallway was a "very tight spot." Officer Nan asked Mathis whether she called anybody based upon the fact that the video showed that Thomas and Fields showed up to the apartment within minutes of Rodgers arriving. Officer Nan believed that Mathis may have called someone for "re-enforcement." Mathis denied calling anybody.

{¶ 10} One of Officer Nan's supervisors told officers at the scene to arrest Mathis for obstructing justice; however, Officer Nan's testimony is not clear on when that order was given, specifically, before or after his second interaction with Mathis. Despite those instructions, Officer Nan did not arrest Mathis, tell Mathis that she was under arrest, or seize Mathis or any items at the scene. While he initially testified that he never told Mathis or any of the adults in her apartment that they could not leave the apartment, on cross-examination, Officer Nan said that the adults in Mathis's apartment, including Mathis, were ordered not to leave until the investigation was complete.

{¶ 11} Detective David Borden ("Detective Borden"), a member of Cleveland Police Department's Homicide Unit, responded to the apartment building around 10:30 p.m. and spoke to Mathis inside her apartment to try to figure out why Rodgers was at her apartment. There were five to six other people in the apartment during their discussion, during which Mathis told him that her sister was dating Rodgers, the two had "some kind of altercation," and her sister left Rodgers at the rapid station.

**{¶ 12}** During his conversation with Mathis, Detective Borden learned that the security camera footage showed:

> The two suspects arrived at a common hallway door to the apartments. The victim goes up, lets them in, and they all go back walking towards the basement where [Mathis's] apartment is, 102. The one gentleman goes in the apartment. He's in there. The other gentleman stands by the doorway. He comes back out, and then there's some exchange of words, and then the victim is shot.

**{¶ 13}** Upon learning the above information, Detective Borden believed that someone may have called Thomas and Fields to the apartment complex and invited Mathis to talk in his police car so they could speak privately. Mathis sat in the front seat of the car, the car door was not locked, and she was not detained and was free to leave. He said that he did not tell her she was free to leave though. In the car, Detective Borden asked Mathis whether she called "anybody to come over," but Mathis again denied calling anyone.

**{¶ 14}** After talking to Mathis in the police car, Detective Borden and Mathis returned to her apartment, and Detective Borden asked Mathis if he could search her phone, providing her a consent-to-search form. The form, which was dated February 27, 2015, at 3 a.m., stated:

> I, Jasmine Mathis, having been informed of my Constitutional rights not to have a search made of the premises herein, after mentioned without a search warrant, and of my right to refuse consent to search, hereby authorize Detective Borden, Detective Etenok of the Cleveland Police Department to conduct a complete search of my cell phone described as follows. Black smartphone no. [xxxxxxxxx].

> I am the owner of the cell phone to be searched. These officers or agents are authorized by me to take from my phone any images, videos, texts, contact list, recent calls they may desire.

This written permission is being given by me to the above-named persons voluntarily and without threats or promises of any kind.

I also understand that I will be given a copy of this consent for any property taken.

Mathis signed the bottom of the form.

{¶ 15} Detective Borden testified that in addition to the form, he explained her rights to her and said that she could consent to the search and "[i]f not, [he] would seek a search warrant." He said his tone was conversational. On cross-examination, Detective Borden stated that he told Mathis, "You can consent. But if you don't consent I will have to get a search warrant. That is what I have to do[,]" and "If you sign the consent form, it will be quicker. If I have to get a search warrant, it's [going to] take longer, which is the truth. It was a Friday night. There are no judges or prosecutors available on Saturday or Sunday, so you're looking into next week which makes it longer." He testified that he did not promise Mathis that she would have her phone returned to her that same day if she signed the consent form.

{¶ 16} After receiving her consent, Detective Borden seized Mathis's phone, which was sitting on a table in her apartment, as evidence and later had it downloaded. He said that Mathis gave him the cell phone and that he did not make any threats or promises to cause Mathis to sign the form.

{¶ 17} Detective Borden testified that Mathis was not placed under arrest, brought down to the police station, or forcefully removed from her apartment. Detective Borden did not remember any police officers being inside Mathis's

apartment, besides when he went inside the apartment to obtain her consent to seize and search her cell phone.

{¶ 18} In September 2018, the trial court denied Mathis's motion in a written opinion, finding that (1) her statements should not be suppressed because she was not in custody and therefore not entitled to *Miranda* warnings, and (2) her phone was legally seized and searched because Mathis signed a consent form allowing officers to search her phone.

{¶ 19} The case against Mathis and Fields then proceeded to a joint trial by jury, during which the following evidence was presented with respect to the charges against Mathis.

{¶ 20} Mathis had some people over to her apartment on February 26, 2015. Earlier that evening, Mathis's sister went to the Rapid Station to pick up Rodgers, but the two got into an altercation and Mathis's sister left Rodgers there. The security footage of the first-floor hallway shows that at 9:31 p.m., Rodgers showed up and Mathis's sister let him in through the building's locked front door. Rodgers and Mathis's sister then entered Mathis's apartment at 9:32 p.m. During her interview with Detective Borden, Mathis said she heard her sister yelling at Rodgers in the hallway during this time and, despite her sister telling Rodgers to leave, Rodgers rushed through Mathis's door into her apartment. Mathis said she did not know Rodgers and asked him to leave her apartment. Mathis told Detective Borden that Rodgers refused to leave, took his jacket off, was fidgeting with himself as if he had a gun, and sat down. Mathis said her brother told Rodgers to leave and that

eventually Rodgers, Mathis's brother, and Mathis's sister went into the hallway. Mathis said she was scared and called "C.J.," who was identified as Marion Jenkins ("Jenkins"), to tell him what was going on.

{¶ 21} The security camera footage shows that at 9:38 p.m., while Rodgers, Mathis's sister, and Mathis's brother were out in the hallway, Thomas and Fields showed up, and Rodgers let them into the building. Thomas and Fields immediately walked to Mathis's apartment. Thomas went inside Mathis's apartment for a few seconds and Fields stood in the doorway. The security footage shows that at 9:39 p.m., Thomas handed Fields a gun and Fields shot Rodgers multiple times. Thomas and Fields then fled the scene.

{¶ 22} Thomas testified that he knew Mathis because she had a child with his cousin, Donald Baines. He said he also knew Fields from meeting him in the neighborhood a few times. Thomas said that he carried a gun for his protection and that Fields knew he had a gun.

{¶ 23} Thomas testified that he was walking with Fields near West 83rd Street on February 26, 2015. Fields was talking on the phone, and at one point, Thomas and Fields "veered" towards Mathis's apartment complex and entered the building after a man, later identified as Rodgers, let them in. Thomas said he did not know Rodgers, but recognized Mathis and Mathis's sister when he and Fields went to Mathis's apartment. Thomas stood in the doorway to the apartment and heard Mathis's sister and Rodgers having a "heated" conversation in the hallway. After Mathis's sister entered the apartment, Thomas heard Rodgers swear at Fields,

who was also standing in the hallway. Fields told Thomas to give him Thomas's gun, which Thomas did, and Fields shot Rodgers. Thomas and Fields then ran from the building.

{¶ 24} Thomas stated that Fields was on the phone from the time they were walking together until the shooting occurred. Thomas identified himself and Fields as the men shown in still images taken from the security camera footage.

{¶ 25} Officer Nan's testimony was largely consistent with the testimony he gave at the suppression hearing. He testified that when he talked to Mathis, she denied knowing Thomas and Fields.

{¶ 26} Detective Borden's testimony at trial was also largely consistent with the testimony he provided at the hearing on Mathis's motion to suppress. He said he learned that Mathis and her sister knew Thomas and Fields and focused his investigation on them. Mathis told him that Thomas and Fields were just guys "that just happened to show up at her apartment and shot [Rodgers]." He said he began asking Mathis about her cell-phone use after learning that "[Mathis] was on her phone when [the suspects] showed up right before and after she was on her cell phone." He testified that based upon information he learned, "it was obvious to me that somebody had called or contacted these [suspects]" and that after receiving their consent, seized cell phones from all of the adults in Mathis's apartment.

{¶ 27} He said he eventually received the "cell phone dump" from Mathis's cell phone, which showed that there were two phone calls deleted from her call log to Marion Jenkins and Reginald Baines and that they were deleted right around the

time of the shooting. Specifically, he said the call log showed that Mathis made numerous phone calls before and after the incident, including calls to and from Jenkins and Baines, but that she only deleted the 9:25 p.m. call from Jenkins and the 9:38 p.m. call to Baines. During her interview in March 2015 with Detective Borden, Mathis admitted that she lied when she told him at the scene that she did not call anyone because she was scared.

{¶ 28} The state presented testimony establishing Mathis's connection with Thomas and Fields. Detective Borden testified: "Jasmine Mathis has a son with Donald Baines. Donald Baines and Reginald Baines are brothers. They are cousins to Senekia Gray, [who] is the mother of Terry Thomas. They all live or hang out or socialize in the area of West 83rd and Detroit." The state also presented testimony from Whittni Slater, who testified that Mathis knew Fields from the neighborhood and she had seen Mathis with both Fields and Thomas.

{¶ 29} Detective Dwayne Duke ("Detective Duke") testified that he extracted information from the phones Detective Borden collected, including those from Mathis's sister, Fields, and Mathis. Detective Duke's reports were admitted into evidence. The report on Mathis's phone shows a phone call from "Regg" to Mathis's phone on February 27, 2015, at 9:38 p.m. and a phone call from Mathis's phone to "Cj2" on February 27, 2015, at 9:25 p.m. were deleted from the phone. Detective Borden testified that he later learned that "Cj2" was Marion Jenkins.

{¶ 30} The state rested, and Mathis moved for an acquittal under Crim.R. 29. The trial court denied her motion.

{¶ 31} Mathis did not present any witnesses in her defense, and she renewed her Crim.R. 29 motion, which the trial court again denied.

{¶ 32} The jury found Mathis not guilty of obstructing justice but guilty of tampering with evidence without the one-year firearm specification. The trial court's November 21, 2018 nunc pro tunc entry indicates that the count for tampering with evidence was amended to delete the one-year firearm specification.

{¶ 33} The trial court sentenced Mathis to a one-year prison term and advised Mathis that she would be subject to a discretionary term of postrelease control for up to three years.[3]

{¶ 34} It is from this judgment that Mathis now appeals.

## II. Law and Analysis

### A. Motion to Suppress

{¶ 35} In her first assignment of error, Mathis argues that the trial court erred in denying her motion to suppress with respect to the search of her cell phone. Specifically, she states that while the trial court's opinion noted that she signed the consent-to-search form, the trial court failed to analyze whether her consent was voluntary, an argument she raised in her motion to suppress. She maintains that her consent was not voluntary and that the evidence retrieved from her phone should have been suppressed.

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to

---

[3] Mathis was released on October 13, 2019.

resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶ 36} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. Ohio Constitution, Article I, Section 14, is nearly identical to its federal counterpart. *State v. Kinney*, 83 Ohio St.3d 85, 87, 698 N.E.2d 49 (1998).

{¶ 37} For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant. *See Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Warrantless searches and seizures are considered per se unreasonable, unless an exception to the warrant requirement applies. *Id.* at 357.

{¶ 38} One exception to the warrant requirement is voluntary consent. *State v. Riedel*, 2017-Ohio-8865, 100 N.E.3d 1155, ¶ 32 (8th Dist.), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The state bears the burden of proving voluntary consent, and it must prove by "clear and positive" evidence that the consent was "freely and voluntarily" given and was not contaminated by any duress or coercion. *Id.*; *State v. Rodriguez*, 8th Dist. Cuyahoga No. 98422, 2013-Ohio-491, ¶ 21.

{¶ 39} The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckloth* at 227. The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness; i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

> Important factors in determining whether a consent was voluntary are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*State v. Washington*, 8th Dist. Cuyahoga No. 86370, 2006-Ohio-568, ¶ 20.

{¶ 40} Further, "[k]nowledge of the right to refuse is not a prerequisite to voluntary consent, but consent must not have been coerced by threats or force or by a claim of lawful authority." *State v. Moncrease*, 8th Dist. Cuyahoga Nos. 76145, 76146, and 76147, 2000 Ohio App. LEXIS 1650, 9 (Apr. 13, 2000), citing *Schneckloth*. "The voluntariness of consent is vitiated by police statements that lead the person to believe that refusing consent will be fruitless." *Id.* at 9-10, citing *State v. Foster*, 87 Ohio App.3d 32, 621 N.E.2d 843 (2d Dist.1993).

{¶ 41} To support her claim that her consent was not voluntary, Mathis cites to *Moncrease*, *State v. Bradford*, 4th Dist. Adams No. 09CA880, 2010-Ohio-1784, and *State v. Ludington*, 7th Dist. Columbiana No. 99CO13, 2000 Ohio App. LEXIS

3986 (Aug. 23, 2000), all of which found that the defendants did not voluntarily consent to search.

{¶ 42} In *Moncrease*, the state appealed the trial court's order granting the defendant's motion to suppress. Agreeing with the trial court's decision, we stated:

> The sudden and forcible entry of the police into his home, their show of strength through the number of officers, and their use of guns and handcuffs created a coercive environment. Though [the defendant] was not handcuffed and was not surrounded by all of the officers on the premises at the exact moment he was asked to give consent, the coercive forces cited by the [trial] court were sufficiently recent to conclude they continued to affect [the defendant]; he was aware that all of the officers remained nearby, on the premises. Furthermore, [the defendant] was told the police were probably going to obtain a warrant anyway, making him believe a search would occur whether he consented or not.

*Id.* at 11.

{¶ 43} In *Bradford*, the state appealed the trial court's order granting the defendant's motion to suppress. The Fourth District reviewed a number of factors in determining whether the defendant voluntarily consented to the search of his property, including the defendant's custodial status, the presence of coercive police tactics, the extent and level of cooperation with police, the defendant's awareness of his right to refuse, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found. *Id.* at ¶ 44-52. The court specifically found that:

> (1) the defendant was in police custody involuntarily because although he was not under arrest, he was not free to leave the trailer;

> (2) the police acted coercively "for hours" by knocking on the defendant's door, announcing their presence, and saying that the defendant "might as well open [his door]" or they would get a search

warrant and "implied to [the defendant] that it would be futile to refuse consent to search the property;

(3) the police did not inform the defendant that he could refuse to consent and the police did not read the defendant the consent form, but merely handed him the form and told him to sign it; and

(4) the defendant "had every reason to believe marijuana would be found."

*Id.* The court found that "there [was] some evidence in the record to support the trial court's finding that, based on the totality of circumstances, the state failed to demonstrate that [the defendant's] consent was voluntary." *Id.* at ¶ 53.

{¶ 44} In *Ludington*, 7th Dist. Columbiana No. 99CO13, 2000 Ohio App. LEXIS 3986 (Aug. 23, 2000), the state appealed the trial court's order granting the defendant's motion to suppress evidence that was collected from a search of his home. On appeal, the Seventh District stated:

It is relevant that [the defendant] was called home from work to address a situation where police were attempting to talk with his wife into allowing them to search the house. When he arrived, six officers were there to meet him. They were wearing task force outfits with identification hanging from their necks and carrying guns. They had his wife waiting outside with them for thirty minutes. They would not allow him to enter his own home.

* * *

[The defendant] was also informed that the officers smelled marijuana[.] * * * [The defendant] was informed that if he refused consent, the officers were prepared to go to a judge with the reports and the allegation that they smelled marijuana. * * * As aforementioned, a person could draw a reasonable inference from this statement that the officers were confident in their ability to obtain a warrant. The court determined that a reasonable person in this situation would feel that the police were implying that it was futile to refuse consent.

*Id.* at 10-11. The court noted that although the only witness at the suppression hearing was one of the six police officers present at the search and no conflicting testimony regarding the defendant's consent was presented, "the court as the fact-finder and the judge of credibility obviously found that the officer's testimony that consent was freely given was insufficient to meet the state's burden of proving voluntariness by clear and convincing evidence." *Id.* at 11. The court concluded, "Considering the number of officers, their characterization of the incriminating evidence, the restriction upon entering the home and other relevant factors[,] we cannot say that the court was incorrect in its assessment of the totality of the circumstances." *Id.* at 11-12. Therefore, the court affirmed the suppression.

{¶ 45} In arguing that Mathis's consent was voluntary, the state relies on *Riedel*, 2017-Ohio-8865, 100 N.E.3d 1155. In that case, the defendant appealed the trial court's order denying his motion to suppress evidence, arguing that he did not voluntarily sign the consent-to-search form. The court reviewed the trial court's factual findings related to the defendant's consent and stated:

> The evidence clearly demonstrates that prior to signing the consent to search form, Sergeant Ross explained the rights [the defendant] was waiving and that he had the right to refuse consent. During the suppression hearing, [the defendant] acknowledged that he believed it would be in his best interests to consent to the search and that he signed the consent to search form presented to him. The fact that [the defendant] signed a written waiver is strong proof that the waiver was valid. * * *

> [The defendant] was not subjected to an officer's continued pursuit for consent once the first request for permission to search was denied. * * * Both [the defendant] and Sergeant Ross stated that the conversation was "cordial" and that [the defendant] agreed to sign the consent form

because he believed it was in his best interest to cooperate with the police.

*Id.* at ¶ 43 and 45. The court therefore found "competent, credible evidence" that the defendant "freely and voluntarily consented to the search when he signed the consent to search form" and affirmed the trial court's denial of his suppression motion. *Id.* at ¶ 47.

{¶ 46} In the instant case, although the trial court did not state that Mathis's consent was voluntary, it clearly found that it was. Its written opinion denying Mathis's motion stated, "After interviewing [Mathis,] officers went over a consent to search form with [her], which would allow officers to download her cell phone. [Mathis] signed the form, giving officers access to her phone. As such, [Mathis's] Fourth Amendment rights were not violated."

{¶ 47} After a review of the record, we find competent, credible evidence to support the trial court's finding that Mathis voluntarily consented to the search of her phone. Even though Officer Nan testified that Mathis was not free to leave until the investigation was complete, at the time Mathis consented to the search of her phone, she was not under arrest and in her own apartment with family members present. The consent-to-search form explained that Mathis could refuse to consent to the search.

{¶ 48} As to the presence of coercive police procedures, just because Detective Borden told Mathis that he would seek a warrant does not render her consent involuntary. *See Reidel*, 8th Dist. Cuyahoga No. 104929, 2017-Ohio-8865,

at ¶ 40 (upholding denial of motion to suppress even though the detective told the defendant the police "were going to get a search warrant for the home regardless."). This case is distinguishable from *Moncrease*, 8th Dist. Cuyahoga Nos. 76145, 76146, and 76147, 2000 Ohio App. LEXIS 1650, 9 (Apr. 13, 2000), where we held that "[the defendant] was told the police were probably going to obtain a warrant anyway, making him believe a search would occur whether he consented or not." *Id.* at 11. In *Moncrease*, the defendant actually testified that he signed the consent form because "he did not feel he had a choice" and a partial search of the defendant's property had already taken place. *Id.* at 4, 10. Here, however, Mathis did not provide testimony establishing that she felt that she did not have a choice and no search of her phone had yet taken place.

{¶ 49} Additionally, we find that Detective Borden's statement was more informative rather than threatening. He did not falsely claim to have a search warrant, but instead was candid about the steps he would take if Mathis chose not to consent. "Where the record clearly reveals no coercion and a police officer does not falsely claim possession of a search warrant, but rather candidly informs a person why a search is needed, either with his consent or with a search warrant, and the person clearly understood that he had a constitutional right to withhold consent, a finding of voluntariness is appropriate." *State v. Clelland*, 83 Ohio App.3d 474, 481, 615 N.E.2d 276 (4th Dist.1992).

{¶ 50} Further, while this court in *Moncrease* found that the detective's statement that he would get a warrant rendered the defendant's consent

involuntary, coercive police procedures are only one factor that a trial court considers. In *Moncrease*, *Ludington*, and *Bradford*, there were many other factors that the trial and appellate courts found to render the defendants' consent involuntary. Here, the trial court did not find that the other factors established that Mathis's consent was involuntary, and we find that the record supports that conclusion.

{¶ 51} Accordingly, we overrule Mathis's first assignment of error.

## B. Sufficiency of the Evidence

{¶ 52} In her second assignment of error, Mathis argues that there was insufficient evidence to convict her of tampering with evidence because the state failed to present sufficient evidence that she knew at the time she deleted the two phone calls that an investigation was in progress or likely to be instituted.

{¶ 53} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v.*

*Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 54} Tampering with evidence has three elements: "(1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11.

> Tampering with evidence under R.C. 2921.12(A)(1) requires a person to act with purpose, meaning that the person has a specific intention to cause a certain result. *See State v. Skorvanek*, 182 Ohio App.3d 615, 2009-Ohio-1709, 914 N.E.2d 418, ¶ 21 (9th Dist.); R.C. 2901.22(A). When determining whether the defendant acted purposely, a defendant's state of mind may be inferred from the surrounding circumstances. *State v. Rock*, 3d Dist. Seneca No. 13-13-38, 2014-Ohio-1786, ¶ 13, citing *Skorvanek* at ¶ 21.

*State v. Sharp*, 8th Dist. Cuyahoga No. 103445, 2016-Ohio-2634, ¶ 19.

{¶ 55} Here, Mathis argues that there was insufficient evidence of the first element. Regarding a defendant's knowledge of an ongoing or likely proceeding or investigation, "there is [commonly] no direct evidence of a defendant's state of mind so the state must rely on circumstantial evidence to satisfy this element of its case. A defendant's state of mind may be inferred from the totality of the circumstances." *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 43 (8th Dist.). Circumstantial evidence and direct evidence inherently possess the same probative value. *State v.*

*Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988).

{¶ 56} The likelihood of an investigation is measured at the time of the alleged act of tampering. *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, ¶ 21. "[T]he state must demonstrate that the accused knew of a pending official proceeding or investigation or knew that such a proceeding or investigation was likely to be instituted at the time of the concealment." *Id.* at ¶ 2. "Knowledge that a criminal investigation is imminent is based upon a reasonable person standard." *Sharp* at ¶ 18, citing *State v. Workman*, 2015-Ohio-5049, 52 N.E.3d 286 (3d Dist.).

{¶ 57} The record shows that Mathis made a number of phone calls immediately before the shooting took place, including numerous calls to and from Jenkins and Reginald Baines. However, she only deleted two of those phone calls from her call log — one from Jenkins at 9:25 p.m. and one to Reginald Baines at 9:38 p.m. Fields and Thomas arrived at Mathis's apartment at 9:38 p.m. and, within a minute of being there, shot and killed Rodgers. Fields's and Thomas's actions led to a homicide, which was likely to be and actually was reported to police almost immediately after it occurred. Further, Mathis misled police in her initial statements, in which she said she did not know Thomas or Fields and did not call anyone over to the apartment. But testimony established that Mathis knew Thomas

because he was cousins with her child's father, Donald Baines, and knew Fields because they lived in the same neighborhood. There was also testimony that Mathis had been seen with Thomas and Fields in the neighborhood. Also, Mathis later admitted to Detective Borden that she lied about not calling anyone. The evidence presented at trial allowed the jury to infer that (1) Mathis knew that an investigation was likely, (2) the police would come to her apartment due to the fact that Fields, Thomas, and the victim were there before the homicide; that the homicide occurred immediately outside her apartment; and that she knew both Fields and Thomas, and (3) the police would be investigating why Fields and Thomas came to the apartment and who summoned them there. Thus, the evidence, although circumstantial, was sufficient to prove beyond a reasonable doubt that Mathis committed tampering with evidence.

{¶ 58} Accordingly, we overrule Mathis's second assignment of error.

{¶ 59} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., and
MICHELLE J. SHEEHAN, J., CONCUR