**[Cite as *State v. Fields*, 2020-Ohio-4740.]**

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 107971 |
| v. | : | |
| KURTIS FIELDS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 1, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-620952-C

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Jeffrey Schnatter and Fallon M. Radigan, Assistant Prosecuting Attorneys, *for appellee.*

Friedman & Gilbert and Mary Catherine Corrigan; and Allison F. Hibbard, *for appellant.*

PATRICIA A. BLACKMON, P.J.:

{¶ 1} Kurtis Fields ("Fields") appeals from his convictions for murder and other associated offenses, as well as his sentence of 34-years-to-life in prison, and assigns the following errors for our review:

I.     The convictions were against the manifest weight of the evidence.

II.    Appellant's sentence is contrary to law and the record does not support the imposition of maximum consecutive sentences.

III.    Mr. Fields was denied the effective assistance of counsel.

{¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.

{¶ 3} On February 26, 2015, Jasmine Mathis ("Jasmine") had a small gathering at her apartment on W. 83rd Street in Cleveland. Tyrone Rodgers ("Rodgers"), who was dating Jasmine's sister Jerica Mathis ("Jerica"), arrived at Jasmine's apartment, but after a few minutes Jasmine told him to leave. Video obtained from a security camera located in the first-floor hallway of the building shows that Rodgers, Jasmine, and Jerica went into the hallway of the apartment building. Two males wearing hoodies arrived at the apartment complex, and Rodgers let them into the hallway through the security door. One of the males gave a gun to the other male, who shot Rodgers multiple times, and both men left the building.

{¶ 4} Cleveland police officers responded to a call of shots fired at the apartment complex. Rodgers was lying on the stairs just inside the building. He was

bleeding and going in and out of consciousness. Rodgers died that evening at MetroHealth Medical Center as a result of multiple gunshot wounds.

{¶ 5} Cleveland police officer Vasile Nan spoke to residents of the apartment building and began investigating the shooting. He learned that Rodgers was visiting Jasmine's apartment. He also learned of the surveillance video, but because the two suspects were wearing hoodies, it was hard to identify them. In early March 2015, the police released two still photographs from the surveillance video, and the investigation led to the names of numerous men. Ultimately, people from the neighborhood identified Fields as the male who shot Rodgers and Fields's co-defendant Terry Thomas ("Thomas") as the male who handed Fields the gun.

{¶ 6} On September 8, 2017, Fields was indicted for various offenses associate with the death of Rodgers. On October 2, 2018, a jury found Fields guilty of murder in violation of R.C. 2903.02(A); murder in violation of R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(1); and felonious assault in violation of R.C. 2903.11(A)(2), all with one- and three-year firearm specifications. On November 7, 2018, the court found Fields guilty of having a weapon while under disability in violation of R.C. 2923.13(A)(2) and (3) as well as notice of prior conviction and repeat violent offender specifications. That same day, the court sentenced Fields to 34-years-to-life in prison. It is from these convictions and prison sentence that Fields appeals.

**Manifest Weight of the Evidence**

{¶ 7} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive than the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶ 8} An appellate court may not merely substitute its view for that of the jury, but must find that in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 9} In the instant case, Fields challenges "the identification of the shooter depicted in the surveillance video." The following testimony relating to this issue was presented at trial:

{¶ 10} Whittni Slater testified that in 2015 she was living in the area of W. 83rd Street in Cleveland. She knew Fields and Thomas from the neighborhood. Slater reached out to the police after seeing "pictures from screen shots from a surveillance video." Slater identified Fields and Thomas as the two men standing in the hallway of the apartment building in question on February 26, 2015. Slater further testified that she identified Fields and Thomas because she knew who they were. Slater was not present at Mathis's apartment on the night of the shooting.

{¶ 11} Slater also testified that Fields knew Reginald Baines and an individual who goes by the nickname "C.J.," because they were all "good friends." It was established at trial that Jasmine placed, and then later deleted, calls to Baines and C.J. "right around the time" of the shooting.

{¶ 12} Thomas testified that in February 2015, he was familiar with the area of W. 83rd Street and Detroit Avenue in Cleveland. Thomas knew people from the neighborhood, and he knew that Jasmine lived in the apartment building in question in this case. Thomas met Fields about "a week or two" prior to the murder at issue. On the night of February 26, 2015, Thomas was "walking up and down Detroit selling crack" when he bumped into Fields, who was on the phone. They walked to Mathis's apartment "to get some warmth because I was out there, it was a little cold." According to Thomas, "a dude" let them into the building. Thomas did not know the "dude." They went to the "bottom," or the basement, of the building where Mathis's apartment was located, and there were a few people in the hallway having a "heated" discussion. Thomas recognized Jasmine and Jerica.

**{¶ 13}** Thomas testified that he was carrying a gun that night. According to Thomas, he "didn't go nowhere without it," and Fields knew this. Thomas testified that one day, he adjusted his jogging pants "to make sure the gun don't fall" and Fields saw this. On the night of the shooting, Thomas and Fields both had hoodies on. Thomas testified as follows about what happened next:

A: I'm in the doorway trying to see what's going on. Next thing I heard was, "Bitch ass nigga."

Q: Could you tell us who said that?

* * *

A: Yeah. It was the dude that let us in.

Q: Could you tell what was happening that caused him to say that?

A: No.

Q: When you hear that, what happens next?

A: I heard, "Give me the gun."

Q: Who did you hear say that?

A: Fields.

Q: Where was he in relation to you?

A: He was outside the door. * * *

Q: When he said that, what did you do?

A: I passed him the gun because I didn't know what was going on.

Q: Describe how you passed him the gun.

A: He was reaching. I backed up and I handed him the gun.

Q: What happens * * * after you handed Mr. Fields the gun?

A:     He shot the dude.

* * *

Q:     After the shooting, what happens?

A:     He ran out.  I waited a little minute, then I ran out.

{¶ 14}  It is undisputed that on September 17, 2018, Thomas entered into a plea agreement with the state in exchange for his testimony in this case.  Thomas pled guilty to manslaughter and carrying a concealed weapon, with a minimum sentence of community control sanctions and a maximum sentence of 12 and ½ years in prison.  Thomas testified against Fields in the case at hand on September 24, 2018. On November 19, 2018, the court sentenced Thomas to five years community control sanctions for his role in the shooting.

{¶ 15}  Senekia Gray testified that she is Thomas's mother.  She identified a picture that the police posted on Instagram of Thomas standing in the hallway of an apartment building.  According to Gray, the police were trying to solicit leads for a homicide that happened on W. 83rd Street.  She asked her son about the picture, and he said someone got shot in front of him.  During her testimony, she also identified Thomas from the surveillance video.

{¶ 16}  Cleveland Police Homicide Detective David Borden ("Det. Borden") testified that he was the lead detective investigating Rodgers's death.  After talking to Jasmine, Jerica, and their friends, the police did not learn the identity of the two males shown in the surveillance video footage.  Det. Borden testified that Jasmine and Jerica were not helpful in turning this information over to the police.  Jasmine

told Det. Borden that she did not know who the suspects were, and that they were "[j]ust good Samaritans [who] stopped by to see what was going on and find out what's happening" when she and Rodgers got into a "heated" discussion.

{¶ 17} In contradiction to Jasmine's account, the police learned that Jasmine and Jerica knew who the suspects were, but the police were still not able to get their names. On March 9, 2015, they "developed still photos from the video that were released to the news media." According to Det. Borden, this "is not the preferred method" of identifying suspects, because they "don't want people to know who we're looking at."

{¶ 18} Det. Borden received anonymous information that one of the males from the photographs was Thomas, and ultimately, they learned that Thomas and the father of Jasmine's child were cousins. Det. Borden further learned that Jasmine deleted calls from her cell phone log that she made just before Thomas and Fields showed up at her apartment building. Jasmine was subsequently convicted of tampering with evidence, which this court affirmed in *State v. Mathis*, 8th Dist. Cuyahoga No. 107986, 2019-Ohio-4887.

{¶ 19} After identifying Thomas as the male who handed over the gun in the video, the police still were not able to identify the shooter. The police received leads from various people, including two parole officers, indicating that the shooter was many different people, including Darrieus Welch, Darren Smiley, Jamie Winlet, Ronald Walker, Javon Mondi, and Kurtis Fields. Ultimately, the police focused on

Fields as the suspected shooter. Det. Borden testified that "[t]hose leads didn't go anywhere on those folks, the other people that are mentioned."

{¶ 20} Britney Johnson testified on behalf of Fields. Johnson testified that she went to high school with Rodgers, and she learned from one of their classmates, Britany Hampton, that the Cleveland Police Department released two photos in an attempt to identify the man who killed Rodgers. According to Johnson, "One photo like clearly states a young man's face. The other one does not because it's hooded. But you can see definition of an individual." Johnson testified that she believed this individual was someone named Javon Mondi. Johnson testified that Hampton also believed the individual was Javon Mondi. At that time Javon Mondi was Johnson's boyfriend and Hampton's child's father.

{¶ 21} Johnson contacted the police sometime in March 2015, and they interviewed her in April 2015. Johnson testified that she did not know whether the police followed up on the information she gave them.

{¶ 22} On appeal, Fields argues that the only evidence implicating him was Slater and Thomas's identification of him as the shooter. Fields further argues that there was no "forensic evidence tying Fields to the crime scene or any of the individuals involved." According to Fields, the evidence in this case was "unreliable to prove identity."

{¶ 23} The credibility of a witness's identification testimony is a matter for the jury or finder of fact. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute

its own judgment for that of the finder of fact." *State v. Awan* 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "A jury is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶ 24} Two witnesses identified Fields as the shooter. One of the witnesses, Thomas, was Fields's codefendant; however, the jury was instructed regarding Thomas's plea deal as follows: this "may affect his credibility and may make his testimony subject to grave suspicion and require that it be weighed with great caution." Furthermore, Slater's identification is based on surveillance video footage of Fields and Thomas on the night in question, and Slater knows Fields and Thomas. In *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 19, this court affirmed a defendant's convictions in part because "the evidence established that [the witness who identified the shooter] was well acquainted with Winters * * *."

{¶ 25} Slater testified that she knew Fields to have a tattoo between his eyebrows. Asked if the man she identified as Fields in the photograph had a tattoo between his eyebrows, Slater replied, "No." However, it is undisputed that this individual had the hood of his sweatshirt pulled up, and because of the angle of the photos, his forehead and eyebrows are shadowed. Thomas also testified that Fields had tattoos on his face, but that he could not see "that part of his face in the picture."

{¶ 26} Upon review, we cannot say that the jury lost its way and created a manifest miscarriage of justice by convicting Fields of killing Rodgers. Accordingly, Fields's first assigned error is overruled.

**Felony Sentencing**

{¶ 27} R.C. 2953.08(G)(2) provides, in part, that when reviewing felony sentences, the appellate court's standard is not whether the sentencing court abused its discretion; rather, if this court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under" R.C. Chapter 2929 or (2) "the sentence is otherwise contrary to law," then we may conclude that the court erred in sentencing. *See also State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231.

{¶ 28} A sentence is not clearly and convincingly contrary to law "where the trial court considers the purposes and principles of sentencing under R.C. 2929.11 as well as the seriousness and recidivism factors listed in R.C. 2929.12, properly applies post-release control, and sentences a defendant within the permissible statutory range." *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525.

{¶ 29} Pursuant to R.C. 2929.11(A), the three overriding purposes of felony sentencing are "to protect the public from future crime by the offender and others," "to punish the offender," and "to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden of state or local government resources." Additionally, the sentence imposed shall be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

{¶ 30} Furthermore, in imposing a felony sentence, "the court shall consider the factors set forth in [R.C. 2929.12(B) and (C)] relating to the seriousness of the conduct [and] the factors provided in [R.C. 2929.12(D) and (E)] relating to the likelihood of the offender's recidivism * * *." R.C. 2929.12. However, this court has held that "[a]lthough the trial court must consider the principles and purposes of sentencing as well as the mitigating factors, the court is not required to use particular language or make specific findings on the record regarding its consideration of those factors." *State v. Carter*, 8th Dist. Cuyahoga No. 103279, 2016-Ohio-2725, ¶ 15.

### Repeat Violent Offender Specification

{¶ 31} Pursuant to R.C. 2929.01(CC), a repeat violent offender means a person about whom both of the following apply:

> (1) The person is being sentenced for committing * * * [a]ggravated murder, murder [or] any felony of the first or second degree that is an offense of violence * * *.

> (2) The person previously was convicted of or pleaded guilty to an offense described in division (CC)(1) * * * of this section.

{¶ 32} In the case at hand, the court sentenced Fields as follows: the murders and felonious assaults merged, and Fields received 15-years-to-life in prison, along with three years in prison for the firearm specification; the weapons under disability charges merged, and Fields received three years in prison for the underlying charge, along with three years in prison for the firearm specification; Fields received 10 years in prison for the repeat violent offender conviction.

Furthermore, the court ran all sentences consecutively, for an aggregate of 34-years-to-life in prison.

{¶ 33} On appeal, Fields argues that the trial court improperly sentenced him to an additional ten years in prison for the repeat violent offender specification, because 1) the state waived the specification, and the specification "did not apply to the lesser included offense" of murder; and 2) the court failed to afford him his right of allocution prior to imposing the sentence.

{¶ 34} After the jury verdict, the court had a discussion about the merger of various counts on the record with defense counsel and the state. Additionally, the court asked the state if the RVO specification was "available for sentencing for murder on count 6?" The state responded that it "didn't believe the * * * RVO appl[ies] to an indefinite sentence such as murder." The court stated that it would "consider the issues presented to the court for determination" prior to sentencing.

{¶ 35} At Fields's sentencing hearing, the court properly found that the RVO specification applied to Fields's murder conviction. Murder is expressly listed as a predicate offense under R.C. 2929.01(CC), and the state introduced evidence of Fields's previous convictions for felonious assault, which qualifies as a "felony of the first or second degree that is an offense of violence."

{¶ 36} As to the issue of waiver, defense counsel argued at the sentencing hearing that, at the time of the verdict, the parties stipulated that the RVO specification did not apply to the murder in Count 6. The state responded that at the time the court questioned the application of the statute, the state did not believe

that the RVO specification applied to murder. "Obviously if I thought I was committing the state to any position, I would have done research, but when you read the statute, it clearly applies to murder. You know, it doesn't change what I thought or may have thought at the time that you were considering it, doesn't change the facts that support it, and doesn't change the law as it's written."

{¶ 37} In the court's November 7, 2018 sentencing journal entry, the court stated that it "reviewed the * * * transcript to consider * * * the state's ability to assert an RVO specification as part of the lesser included offense of murder in Count 6. The court finds that the state did not waive [this] right * * *." The court sentenced Fields to ten years in prison for the RVO specification in association with Fields's conviction for murder in violation of R.C. 2903.01(A).

{¶ 38} As to Fields's argument that he was not afforded his right to allocution, we find that the court stated the following prior to imposing sentence: "Mr. Fields, this is your opportunity to tell me in your own words your own thoughts concerning the events that happened there that's been depicted on the video that all of us saw, or anything else in your life that you think is important for me to consider for sentencing purposes."

{¶ 39} Fields responded as follows:

I'd just like to say I agree with my attorneys. I'm sorry for what happened to the victim, I'm sorry that they found him, but I had nothing to do with it. I'm innocent.

As far as what the prosecutor said about my other murder case that I have, I wasn't found guilty of that. The person that passed away on that case, she got — The person that passed away identified me as a white

male with dreadlocks, clearly isn't me. And she also said that she was asleep in the car. So, having them say that I committed another murder after this one is BS. Excuse my language. And the prosecutor had my full name, phone records, and my picture August 15th, 2015. And then I went to jail in July, and they never questioned me, never talked to me. They know I was on parole, never went to them, got my phone records, none of that. I'm innocent. I had nothing to do with that.

{¶ 40} Upon review, we cannot say that the court erred by sentencing Fields to ten years in prison for the repeat violent offender specification. Although the state initially did not believe that this specification applied to the lesser included offense of murder, the court made it clear that it was going to research the law and make a determination prior to sentencing. The court did just this and found that the specification applied to Fields's murder conviction in this case. Furthermore, Fields exercised his right to allocution in open court on the record. Accordingly, his second assigned error is overruled.

## Ineffective Assistance of Counsel

{¶ 41} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 3743 (1989).

{¶ 42} Fields argues on appeal that he was denied effective assistance of counsel in three instances: "(1) his Trial Counsel was ineffective to failing to pursue a Motion to Dismiss Indictment for Pre-Indictment Delay; (2) his Trial Counsel was ineffective for failing to move for recusal of the trial court; and (3) his Trial Counsel was ineffective for failing to move to strike the testimony of Tom Ciula as improper expert witness testimony."

## Preindictment Delay

{¶ 43} On June 8, 2018, while he was represented by trial counsel, Fields filed a pro se motion to dismiss his case for preindictment delay. As Ohio does not allow hybrid representation, the trial court denied Fields's motion on October 29, 2018. The court inquired of Fields's attorneys if they wanted to pursue the motion to dismiss for preindictment delay, and they stated on the record that they did not.

{¶ 44} "Preindictment delay violates due process only when it is unjustifiable and causes actual prejudice." *State v. Kafantaris*, 8th Dist. Cuyahoga No. 105937, 2018-Ohio-1397, ¶ 19. "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 28.

{¶ 45} In the instant case, Rodgers was fatally shot on February 26, 2015, and Fields was indicted approximately two years later, on September 8, 2017.

{¶ 46} Fields argues that his trial counsel should have followed up on his allegation that he attended a Cleveland Cavaliers game with three friends on the night of the murder, February 26, 2015, giving him an alibi. Fields was indicted approximately two-and-a-half years later on September 8, 2017. According to Fields, one of his alibis died on March 23, 2016, another one of his alibis died after he was indicted, and he was unable to locate his third alibi, whose whereabouts were unknown.

{¶ 47} "Actual prejudice is determined by the circumstances of the case and evidence is considered 'as it exists when the indictment is filed' in relation to the prejudice the defendant will suffer at trial due to the delay." *State v. August*, 12th Dist. Warren No. CA2018-12-136, 2019-Ohio-4126, ¶ 12, citing *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 7756 N.E.2d 829, ¶ 52. "The prejudice advanced must be more than merely speculative [and] must be balanced against the other evidence in order to determine whether actual prejudice will impact the defendant at trial." *August* at ¶ 12.

{¶ 48} At the time the indictment, one of Fields's potential witnesses was deceased, and the other two were alive. Obviously, the prejudice that may result from the subsequent death of a potential witness and the fact that Fields could not locate another witness cannot be attributed to the state delaying Fields's indictment. Consequently, the only factor relevant to this claim is the death of a potential witness. "To be sure, the death of a potential witness will not always constitute actual prejudice." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d

688, ¶ 26. The *Jones* Court further held that "the preindictment death of a witness can constitute prejudice 'if the defendant can identify exculpatory evidence that was lost and show that the exculpatory evidence could not be obtained by other means.'" *Id.*, citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 103.

{¶ 49} Fields speculates that the witness who passed away before he was indicted would have testified that Fields attended a Cleveland Cavaliers game on the night Rodgers was murdered. This testimony could have been obtained from either of the other two potential witnesses. Furthermore, there is no evidence in the record that Fields filed a notice of alibi. We must weigh this information against the evidence in the record, specifically, the surveillance video showing a male fatally shooting Rodgers and two witnesses identifying this male as Fields. Upon review, we find that Fields has failed to show actual prejudice; therefore, we cannot say that his counsel was deficient for not filing a motion to dismiss based on preindictment delay.

**Recusal of the Trial Court**

{¶ 50} Fields next argues that his trial counsel was "ineffective for failing to file an affidavit with the Ohio Supreme Court requesting that the Trial Court be disqualified from presiding over the case, after engaging in ex parte communications with two adverse parties to Mr. Fields, namely that State of Ohio and the attorneys for Mr. Thomas."

{¶ 51} The Ohio Supreme Court has "established a two-pronged test regarding whether an alleged ex parte communication constitutes grounds for disqualification. This test first requires proof that the communication either was initiated by the judge or addressed substantive matters in the pending case. Second, the allegations must consist of something more than hearsay." *State v. Nawash* (*In re Calabrese*), 100 Ohio St.3d 1224, 2002-Ohio-7475, 798 N.E.2d 10, ¶ 2.

{¶ 52} In the case at hand, Fields alleges that an ex parte conversation took place in chambers immediately prior to codefendant Thomas pleading guilty. We note that Fields's trial counsel requested to be part of this meeting, but the trial court denied this request. Fields's trial counsel objected to the meeting on the record, all parties were given the opportunity to present argument, and the court noted the objection. Fields now alleges that "[i]t is not contested on the record that Mr. Fields was discussed in this meeting." However, our review of the record shows that Fields's position is not accurate.

{¶ 53} Field's trial counsel stated on the record that "we are not aware of what was discussed" at this meeting. Jasmine's trial counsel stated on the record as follows: "And I don't know what happened. I'm not saying anything nefarious occurred. All I'm saying is we — I wasn't a part of it." Thomas's trial counsel stated on the record as follows: "All that took place in my opinion back in court was [co-counsel] and myself and the assistant county prosecutors * * * talked about what the status of the case was with respect to our client Terry Thomas. And where things were at as far as any plea negotiations or status of his case. That's all it was."

Thomas's trial co-counsel stated that "I want to reemphasize no substantive aspect of the case was discussed. We had no ex parte discussion." The prosecutor agreed with what all defense counsel stated.

{¶ 54} Upon review, we find no proof that the judge initiated the conversation or that substantive matters regarding Fields's case were discussed. Accordingly, we cannot say that Fields's trial counsel was ineffective for failing to request that the trial court be disqualified from hearing his case.

## Improper Expert Witness Testimony

{¶ 55} Fields's final argument under this assigned error is that his trial counsel "was ineffective for failing to move to strike the testimony of Tom Ciula, in whole, as said testimony was expert witness testimony and Mr. Ciula was never tendered as an expert witness."

{¶ 56} In the case at hand, Tom Ciula ("Ciula") testified that he is a forensic video specialist for the Cleveland Police. He has over 30 years of experience "in the audio and video field and specifically as a forensic video specialist I've been doing this for ten years. I have over 500 classroom hours which is in excess of what you would need for a master's degree. And I've worked over 1200 cases." According to Ciula, his work entails the following:

> [E]verything from going out and collecting the video from one or multiple locations, taking that video back into the lab, seeing if there is anything there of an evidentiary value, making sure that that video is as clear as is possible, and then assembling that in a way that makes sense for both the investigators and for the court. * * * Forensic video

specialist basically means that our goal is to make sure that whatever evidence we have is presented in a non-changed, non-altered way.

{¶ 57} Ciula, who testified for the state, introduced the surveillance video of the shooting into evidence. Fields argues on appeal that Ciula was not offered as an expert witness; regardless, "he would not have been accepted as such by the court"; and without Ciula's testimony, Fields would have been acquitted.

{¶ 58} It is undisputed that testimony regarding the surveillance video is relevant to the case at hand. Additionally, pursuant to Evid.R. 702,

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{¶ 59}** Upon review, we find testimony regarding the integrity and accuracy of the video documenting Rodgers's murder satisfies the first prong of Evid.R. 702. For example, Ciula testified that the video

> is collected [and] brought to a lab, and the first thing that is done is what is called a hash is run on it. It is a process that creates an algorithm that spits out a 64-character answer, both numbers and letters. If so much as one pixel — and a pixel is one of the technical words we use. Picture element. In other words, a dot. If one dot in that entire video is changed and it was rehashed the number that would come up would be so grossly different that you could tell immediately something has been altered. So that's what's done with the original evidence to ensure its integrity

**{¶ 60}** Clearly, this testimony "relates to matters beyond the knowledge or experience possessed by lay persons."

**{¶ 61}** We further find that Ciula's qualifications, as noted earlier, rise to the level of expert in his field. Indeed, Ciula has testified as an expert forensic video specialist in multiple cases in the Cuyahoga County Common Pleas Court. *See, e.g., State v. George*, 8th Dist. Cuyahoga No. 103708, 2016-Ohio-7866; *State v. McMiller*, 8th Dist. Cuyahoga No. 103962, 2016-Ohio-5844; *State v. Warmus*, 8th Dist. Cuyahoga No. 99962, 2014-Ohio-928.

**{¶ 62}** In *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 115, the Ohio Supreme Court held that "[w]hile the state never formally tendered [a witness] as an expert, defense counsel never challenged his qualifications to testify and thus waived all but plain error" under Crim.R. 52(B). The *Drummond* Court reasoned that the witness "was qualified to testify as an expert about gang-related matters" under Evid.R. 702, thus any error was harmless.

**{¶ 63}** We find that *Drummond* applies to the case at hand, because Ciula would have qualified as an expert had the state proffered him as one. As Fields cannot show prejudice, his counsel's failure to move to strike Ciula's testimony was not ineffective.

**{¶ 64}** Accordingly, Fields's final assigned error is overruled.

**{¶ 65}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA A. BLACKMON, PRESIDING JUDGE

RAYMOND C. HEADEN, J., and
MARY EILEEN KILBANE, J., CONCUR